MARTHA E. EMMONS *et al.*

*v.*

CATHARINE MOORE.

1. TRUST—*when grantee of land holds in trust.* Where one buys land in the name of another, and pays the consideration money for it, the land will generally be held by the grantee in trust for the person who pays the consideration.

2. Where a father purchased and paid for a tract of land for a crippled son, but had a conveyance made to another son, who knew nothing of the transaction at the time, the reason for so taking the deed being, that the

crippled son, at the time, was involved in debt, and the father was living with a second wife, who would not join with him in making a conveyance if he should take the deed to himself, it was *held*, that the grantee held simply the legal title in trust for the other son.

3. Same—*purchaser without notice.* Although a grantee in a deed may hold the legal title in trust for another, this will not preclude a third person from acquiring the title free from the trust by sale on execution against such grantee, if he has no notice of the manner in which the title is held, and acts in good faith.

4. Judicial sale — *when set aside as a cloud.* Where an attorney brought suit by attachment against his client for the collection of a fee of $100, the client being amply responsible, and residing only about sixty miles distant, where he could have been sued before a justice of the peace, and the debt made, if a meritorious one, and, under the proceedings, land worth over $5000 was sold for only $128, and no notice of the sale and purchase was ever given to the client, it was *held*, under the peculiar circumstances, that, as against the attorney, the sale could not be sanctioned, on bill to set aside the same as a cloud upon the title.

5. Fraud—*title acquired held fraudulent.* Where a party, being a relative, and on the most intimate business relations with others whose land had been sold at a grossly inadequate price, on a judgment in attachment, without the knowledge of the owners, acquired the certificate of purchase, which fact, as well as the sale, he carefully concealed, and had a deed made to a third party for his own benefit, it was held that the concealment of all information from the parties interested when the business relations were so intimate, his recent purchase, together with the inadequate consideration, were sufficient to condemn the transaction as fraudulent, and that it could not be sanctioned in equity.

6. Limitation—*under act of 1839—vacant land.* Where land was sold on execution, and shortly after the sale the judgment debtor, who had no notice of the sale, conveyed the land to another in good faith, under which conveyance the grantee, and those succeeding him, paid all the taxes for seven successive years after the time for redeeming from the sheriff's sale had expired, and while the land was vacant and unoccupied, and then went into possession, it was *held* that the party claiming under the sheriff's sale was barred under the 9th section of the act of 1839.

7. Same—*when it begins to run.* The statute begins to run against a purchaser of land at sheriff's sale, in favor of one acquiring color of title, from the time when such purchaser is entitled to a deed.

8. Same—*payment of taxes.* The fact that two persons appear to have paid taxes jointly on a tract of land after it is divided, will not invalidate the payment of either as to his part of the land. The manner in which the taxes are paid is not material.

9. SAME—*occupancy by squatter.* The occupancy of land by a mere squatter will not prevent the running of the Statute of Limitations as to vacant lands, except as to the part actually occupied.

10. SAME—*enforcement in equity.* While it is true, a court of equity might refuse to set aside a title as barred by the Statute of Limitations, as a cloud upon the title of the one claiming the benefit of the bar, yet, if equitable grounds of relief exist, the bar of the statute may be considered in connection with them.

APPEAL from the Circuit Court of Cook county; the Hon. W. W. FARWELL, Judge, presiding.

Messrs. SCOVILLE & BAYLEY, for the appellants.

Messrs. SLEEPER & WHITON, for the appellee.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill in equity, brought by Catharine Moore, to set aside and cancel, as a cloud upon her title to a tract of land near Chicago, consisting of one hundred acres, a levy under a writ of attachment at the suit of Scoville against Alex. McClurg, a judgment, sheriff's deed, and also a deed from the purchaser at the sheriff's sale to Alfred W. Davidson, and a deed from him to Martha E. Emmons.

The defendants to the bill put in their answers, and after replications were filed, the cause proceeded to a hearing on the evidence, and a decree was rendered as prayed for in the bill, to reverse which this appeal was taken.

The land in question consists of one hundred acres, and was originally owned by Asa Farnsworth. About the first day of March, 1856, James McClurg, Sr., purchased this tract, and Watson S. Hinckley, at the same time, purchased an adjoining tract, consisting of one hundred and sixteen acres. The consideration paid by each party was $5000. The land bought by Hinckley was conveyed to him by Farnsworth, but the tract purchased by James McClurg, Sr., was conveyed to Alex. McClurg, a son, who then resided at Racine, Wisconsin. Hinckley and McClurg, Sr., resided at Westfield, in the State of New York. The deed from Farnsworth, conveying the

land to Alex. McClurg, was placed upon record on the 21st day of May, 1856.

At the time the land was purchased, George Scoville was residing in Chicago, and was engaged in the practice of law. He claimed that Alex. McClurg was indebted to him in the sum of $100, for services as an attorney in a certain case instituted by the firm of Smith, Turner & McClurg against the Racine and Mississippi Railroad Company, and, on the 16th day of June, 1859, he sued out an attachment, and levied upon the land in question. In the following August judgment was rendered, and on the 8th day of October the premises were sold, and bid off by Scoville for $128, the amount of his judgment and costs. The certificate of purchase was sold to Davidson, but, by his direction, it was assigned to one Dyer, who obtained a sheriff's deed for the premises on the 14th day of April, 1863. Dyer then conveyed to Davidson, who subsequently conveyed to his daughter, Martha E. Emmons, and this is the title relied upon by her, which the bill was brought to set aside.

It appears, from the evidence, that at the time James McClurg, Sr., purchased the land, he had a crippled son, James McClurg, Jr., and the land was intended by the father as a provision for the son. At the time the deed was written for Farnsworth to execute, Mr. Hinckley, who assisted in buying the land, and was familiar with the whole transaction, testified that when he sat down to make out the papers, James McClurg, Sr., told him he intended the land for his son James, but as James was at the time involved in litigation, he did not want the title then in his name; but the deed could be made to Alexander, to hold until he could safely have the land conveyed to James. McClurg, Sr., at the time, was living with a wife by a second marriage, and she would sign no deed with her husband unless she was paid a bonus. For this reason he did not want the deed made to him, as he would not then be able to carry out his intention of eventually investing the title in the name of his son. This evidence in regard to the object and intent of James McClurg, Sr., in having the land conveyed to Alexander,

is from a witness who seems to be entirely reliable, and who has no interest whatever in the result, which might have a tendency to prejudice his testimony.  Alex. McClurg had no knowledge that the land had been conveyed to him until the 1st day of November, 1859, when, upon the request of his father, he executed a deed conveying the land to James McClurg, Jr., the person for whom it was originally intended, which deed was recorded Nov. 11, 1859.

It is, therefore, apparent, that while the naked legal title to the premises was vested in Alexander McClurg, the equity was in another.  He held the title in trust.  As said by Story, Equity Jurisprudence, vol. 2, sec. 1201, where a man buys land in the name of another and pays the consideration money, the land will generally be held by the grantee in trust for the person who so pays the consideration.  This, as an established doctrine, is now not open to controversy.

The fact, however, that Alexander held the legal title in trust, nothing appearing upon the deed to show that fact, would not preclude Scoville from obtaining the title by sale upon judgment against Alexander, if he had no notice of the manner in which the title was held.  But the right of Scoville to levy upon, sell and acquire title to his client's land, under the circumstances under which the land in question was sold, might well be questioned.  It will be remembered that McClurg was Scoville's client.  He resided only sixty miles from Chicago, was in business and responsible for all contracts. The collection, therefore, of a fee of $100, if it was meritorious, and justly due, would seem to be an easy task.  A judgment could have been obtained before a justice of the peace where McClurg resided, within a short time, attended with little expense, and the debt collected.  This course, which prudence would seem to dictate, if the only object was to collect a small debt, was not pursued.  But a tract of land, consisting of one hundred acres, which three years before had cost $5000, and which, in the meantime, had, no doubt, largely increased in value, and which, as appears from the evidence, is now worth from $60,000 to $80,000, was seized by attachment, and sold

for $128, to satisfy a debt of $100. This was done, and the time allowed by law for redemption expired, and Scoville gave no notice whatever to McClurg of the proceedings.

While it is true an attaching creditor was at that time under no legal obligation to give personal notice to the debtor of the proceedings, but would be entitled to be protected in his judgment by giving the notice required by statute, yet, under the circumstances of this case, arising from the relations of the parties, the nature of the debt, the small amount thereof in comparison with the value of the land, and the well known residence of the defendant in the attachment, the fact that Scoville failed to give notice to the defendant of the proceedings under which the land was attached and sacrificed by sale, would seem to indicate, the object of the proceeding was not a *bona fide* intention to collect an honest debt. But should it be conceded that Scoville was in a position to acquire the title to the land by sale upon his judgment, Davidson does not, in a court of equity, occupy that position, and it is not pretended that appellant Emmons is a *bona fide* purchaser, for value. Appellee was in possession of the premises when appellant Emmons obtained a deed, and that possession was notice to the world of her title; besides, she paid nothing for the conveyance made to her by her father.

Davidson, as appears from the evidence, married a daughter of James McClurg, Sr. He was, therefore, a brother-in-law to Alexander McClurg and James McClurg, Jr. The relationship alone, however, would not preclude him from acquiring title to the property, but there were other relations existing between him and the McClurgs, that place the matter in a different aspect.

The original deed from Farnsworth to Alex. McClurg, obtained when the property was purchased, was sent by James McClurg, Sr., to Davidson, to be placed upon record. After record, Davidson was the custodian of the paper. Relations of trust and confidence existed between these two parties from 1848 to 1863. Large sums of money were borrowed by Davidson of his father-in law, which, at one time, amounted to

$30,000. The latter held the title to the former's real estate in Chicago, and Davidson acted as agent for McClurg, Sr., in the payment of taxes in Chicago on real estate, and there was frequent and continued communication between the parties. During this period, and while McClurg, Sr., was paying taxes on the property in question, from year to year, for his son, which was well known to Davidson, he acquired the certificate of purchase from Scoville, and secretly held it in the name of Dyer, and gave no intimation to McClurg or any of the family that the land had ever been sold. In August, 1863, he and his father-in-law had a final settlement of their business, which had extended through many years, and even then, although he had then in his possession a deed of this property from Dyer, which he had not, as yet, ventured to place upon record, he did not intimate that he had any claim to this valuable property. But, not only did these relations of confidence and trust exist between the father-in-law, who had purchased the property and was controlling it for the son, but similar relations existed between Davidson and Alex. McClurg, in whose name the title rested. Alexander was banking in Racine, Wis., and Davidson in Chicago, and subsequently in New York. The former kept a bank account with the latter, both in Chicago and New York. Now, while these parties only resided a distance of sixty miles from each other, were relatives, and had constant business relations, and when Davidson knew the property in question was valuable and had been sold on a judgment for a mere trifle, in comparison with its true value, he concealed from Alexander, although all the time he held the deed in his hands which conveyed the premises to Alexander, all information in regard to the sale, and in a secret manner attempted to speculate upon the property of a relative and business friend.

The concealment of all information from the McClurgs, by Davidson, which might lead to the knowledge that the land had been sold, when the business relations between the parties were so intimate; his secret purchase, in connection with the inadequate consideration,—all unite in condemning his purchase as a fraud, which can neither be sanctioned nor upheld in a court

of equity. This is not a case where reliance is placed merely upon the existence of the relationship between the parties, to condemn the act of Davidson in acquiring the title, and hence it can not be governed by *Cleland* v. *Fish*, 43 Ill. 282; but even the rule announced in the case cited would seem to be broad enough to impeach the purchase here. It is there said, " Nor does it appear that Fish had ever acted as the agent of appellant in this or any other business, or had ever been her confidential business adviser, or that she had ever intrusted him with the management of her business affairs. Nor does it appear that he had agreed, in this case, to ascertain the value of her life estate, or the sum for which it could be sold. Had any of these facts been shown, then the trust and confidence might have been inferred which would render it inequitable to fail to make the disclosure."

But, aside from the questions heretofore considered, there is yet another ground upon which the decree may be sustained. If it be conceded that the purchaser under the sheriff's sale acquired title, it is barred under the ninth section of the act of 1839, which provides, that if a person having color of title, made in good faith, to vacant and unoccupied land, shall pay all taxes legally assessed thereon for seven successive years, he shall be deemed and adjudged to be the legal owner, etc.

James McClurg, Jr., obtained a deed November 1, 1859. The sale on the Scoville judgment was made October 8, 1859. In fifteen months from that date the purchaser was entitled to a deed, which would be January 8, 1861, and from this date the statute would begin to run. If, therefore, James McClurg, Jr., or appellee, who claimed from and under him, paid all taxes legally assessed on the land for the full period of seven successive years after that date, and the land was vacant and unoccupied, and, after the seven years payment was complete, took actual possession of the land, then the bar provided by the statute would be complete.

It is clear, from the proof, that in the fall of 1868, appellee, through her agent, Mr. Denham, took actual possession of the land, and has remained in possession ever since.

In the spring of 1861, the taxes of 1860 were paid under the title held by appellee, which was continued each year thereafter until possession was taken, which makes seven successive years' payment of taxes, after a deed was due under the sheriff's sale, before possession taken.

It is said, that during a portion of this time the taxes were paid by Hinckley and McClurg, Jr., jointly, on the whole 216 acres, after the land had been divided. This fact did not, however, invalidate the tax payment. It is clear all taxes legally assessed were paid by the party owning the land; the manner in which it was done is immaterial. Other technical objections have been raised to the proof of payment, but we perceive no substantial defect in the proof.

The only remaining question in this branch of the case is, whether the land was vacant during the seven years the taxes were paid.

It is, no doubt, true, that during a part of this time a small portion of the premises was occupied by a squatter, who made no claim whatever to the land or the right to occupy it. That could only, however, operate to prevent the running of the statute as to the portion of the premises actually occupied.

Aside from the small tract cultivated by a squatter, the land, so far as we understand the proof, was vacant and unoccupied until possession was taken, in 1868, by appellee.

It is true, there was a fence on the east line of the tract, built by an adjoining land owner, and some fencing along the traveled road that passed over a portion of the land, and perhaps some fencing on the south line, but these fences, so far as we can learn from the proof, were erected in 1868, after the bar under the statute was complete.

We are, therefore, satisfied, from the proof, that at the time of the filing of the bill, if appellant acquired any title through the sheriff's sale, it was barred by the ninth section of the act of 1839.

While a court of equity might refuse to set aside a title barred by the statute as a cloud upon the title of the one claiming the benefit of the Statute of Limitations, but would leave

the conflicting title to be settled and adjudicated in a court of law, yet, where equitable grounds exist, as in this case, the bar of the statute may be considered in connection with them.

We are satisfied with the decree of the circuit court, and it will be affirmed.

*Decree affirmed.*