# RUFUS W. ROBBINS *et al.*

## *v.*

## CLIFTON H. MOORE *et al.*

### *Filed at Springfield May 14, 1889.*

1. PURCHASER—*with and without notice—of what notice will be imputed to him.* A *bona fide* purchaser or incumbrancer of the legal estate in land will be protected against a prior equitable title of another of which he had no notice. So when the vendor has acquired the legal title fraudulently, or holds the legal title in trust even, the *bona fide* purchaser without notice of any defect in his title growing out of equities in some other person, will be protected against such equities.

2. A purchaser of land is presumed to have notice of any defect of title apparent upon the face of his title papers or by the public records, and will be required to take notice of the title or claims of persons in possession; but he is not required to look for latent defects in the chain of conveyances, when regular on their face and apparently conveying the legal title.

3. LIMITATIONS—*of the character of possession required.* In 1856 or 1857, a party, under claim of title, took possession of a tract of land by breaking about thirty acres thereof, and sowed it in wheat, but the land was not fenced, though there was a shanty on it. After the wheat crop was harvested no other acts of possession were shown until in 1871,—a period of fifteen years,—when the land was again broken and possession taken. During this period of fifteen years, neither such party nor his grantee was shown to have been in possession, and their possession, if not abandoned, was not of such open, notorious and exclusive character as the law requires: *Held,* that the facts failed to establish a defense in the grantee under the twenty years' limitation law.

4. SAME—*act of 1839—color of title—assignment of note and mortgage.* A purchaser of land, instead of taking a deed from his vendor, took the assignment of a note and mortgage held by the latter, under which he paid taxes: *Held,* that the note and mortgage in the purchaser's hands did not constitute color of title under the seven year's limitation law, as the mortgage was a mere security, and did not purport to convey title to him.

5. SAME—*payment of taxes before color of title.* A party paid all the taxes on land from 1863 to 1869, inclusive, but did not acquire color of title until 1868, and no possession was shown during any of those years: *Held,* that the payment of taxes before the acquisition of the color of title in 1868 was unavailing to create a bar under the statute.

6. ESTOPPEL—*in case of silence—or by acts and declarations—inducing one to buy an adverse title.* A and B had a long contest before the land officers as to their respective rights to receive a patent for a tract of land, which was decided by the final tribunal in favor of A, and he being desirous of selling to C, the latter went to B and asked if he had any claim to the land, saying, that if B had he would not purchase. B informed C that he had no further claim, that he was tired of litigation, and told C to purchase of A, offering to make a quitclaim deed, if desired. On this assurance C bought of A. After B's death his heirs conveyed to D, who filed his bill against C and others, to set aside his title for a conveyance: *Held,* that B, his heirs, and D, were in equity estopped from asserting the title as against C and those claiming under him.

7. Where the foundation of the estoppel is in silence, and omission to give notice of existing rights, the party relying on the same must not have had the means of ascertaining the true state of the title by reference to the public records; but *this rule does not apply when the* land owner has actively encouraged and induced the injured party to act. In the latter case the party making the declaration acted on will be estopped, although he may have been ignorant of his true rights.

8. A court of equity has the power and jurisdiction to establish a title to real estate by estoppel against the true owner, who, by his acts and declarations, has induced another to purchase from one holding under a void deed or patent.

9. WITNESS—*competency—party to suit.* On a bill by the purchaser of land from the heirs of a deceased person, to assert title in his own right, the defendants are competent witnesses in their own behalf.

WRIT OF ERROR to the Circuit Court of DeWitt county; the Hon. GEORGE W. HERDMAN, Judge, presiding.

November 15, 1855, John P. Mitchell purchased at the United States government land sales, the south half of the south-east quarter and the south-east quarter of the south-west quarter of section 27; and Clifton H. Moore the south-west quarter of the south-west quarter of the same section, in town 19 north, range 3 east; and on February 20, 1856, Thomas J. Bunn was allowed to enter the same lands as a pre-emptor, he claiming to have made settlement and placed improvements thereon, beginning November 8, 1855. February 22, 1856, Thomas J. Bunn and wife mortgaged this

land to his father, Lewis Bunn, to secure a loan of $1000, payable in three years, with six per cent interest. Mitchell and Moore contested the right of Bunn to pre-empt the land before the register of the land office, and upon hearing, January 20, 1858, the register held that the contestants had failed to make out their case, and sustained Bunn's entry, and finding that the entries by Moore and Mitchell should be cancelled. They appealed from this decision to the Commissioner of the General Land Office, who reversed the decision of the register, and ordered the entry of Bunn to be cancelled, and that patents issue to Moore and Mitchell for the respective tracts purchased by them. While the case thus stood, on February 1, 1859, a patent was issued to Moore for the south-west quarter of the south-west quarter of said section 27, but none was issued on the Mitchell entry. Shortly after the decision by the commissioner, an appeal was taken by Bunn to the Secretary of the Interior, who, on June 22, 1860, reversed the decision of the commissioner, reinstated the decision of the register, ordered the patent issued to Moore to be returned, and a patent to issue to Bunn for the whole of his entry. Application was made to the Secretary of the Interior, August 23, 1868, to re-open said cause, and for rehearing. The application was denied on the 11th day of September, 1868.

In the spring of 1862, Thomas J. Bunn, being desirous of selling the land, and Lewis Bunn wanting his money, offered to sell the land to Rufus W. Robbins, and Robbins proposed to purchase the same. It is contended by Robbins, that before he would purchase he went to Mitchell and asked him if he had any claim on the land, saying, if there was any dispute about the title he would have nothing to do with it. Robbins testifies, that in answer to such inquiry Mitchell said he had had a lawsuit about the land with Bunn, but that Bunn had beaten him, and that he (Mitchell) did not have any claim on the land, and for him (Robbins) to go ahead and buy it. Robbins alleges that on this assurance of Mitchell he bought the

land of Bunn and paid the entire purchase money, and that, acting under the advice of counsel, instead of taking a deed at that time from Bunn, he took an assignment of the mortgage from Thomas J. to Lewis Bunn, counsel advising that he had better get his title through the foreclosure of said mortgage.

There is considerable conflict in respect of what occurred, but it would seem that Robbins is corroborated, to a greater or less extent, by the testimony of the two Bunns. Robbins also claims that Mitchell, at the time of the conversation before referred to, expressed a willingness to quitclaim any interest he might have in the property to the Bunns, and that on the day when he (Robbins) purchased the land of Bunn, taking an assignment of the note and mortgage before referred to, there was present, in possession of one of the Bunns, a deed executed by Mitchell and wife, conveying the property to Bunn, but which, upon the statement by Robbins that Mitchell had disclaimed any interest in the land, he was advised was unnecessary, and which, acting under the advice of counsel, Bunn then destroyed. The corroboration in respect of said deed comes from Thomas J. Bunn alone, who does not remember anything more than that a paper was present, which, on the back, purported to be a deed from Mitchell and wife to this land. It is shown, however, that some time prior to the sale to Robbins, conversations took place between Lewis Bunn and Mitchell. In these conversations Mitchell expressed himself as tired of litigating in respect of this land, and offered to quit if Bunn would pay the costs that had accrued in the litigation before the governmental departments. It is also shown that Bunn subsequently paid about $300 costs therein, but it is not shown that they were Mitchell's costs, and, on the other hand, it is not shown or claimed that Mitchell paid any costs. In respect of the execution of the deed by Mitchell, there is a sharp conflict in the evidence.

On April 11, 1866, Robbins filed his bill in the DeWitt circuit court, to foreclose the mortgage from Thomas J. to Lewis

3—129 ILL.

Bunn, making Thomas J. Bunn and wife, and Moore, parties defendant. Moore answered, setting up his title to the forty acres in the south-west quarter of the south-west quarter of section 27, and disclaiming as to the residue of the land. On April 10, 1868, Robbins, by leave, amended his bill, making David Davis a party defendant, alleging that said Davis claimed title to the south-east quarter of the south-west quarter of said section under a sale on execution against Mitchell, and a deed thereon, and sought to have Davis' title set aside as a cloud on his title, and also alleging the issue of a patent to Moore, by inadvertence or mistake, for the south-west quarter of the south-west quarter of said section, and sought to compel Moore to convey the title thus acquired, to him, Robbins. Davis and Moore both answered, denying the validity of Bunn's entry as a preemptor, and claiming that the entries by Mitchell and Moore were valid.

At the November term, 1869, the court rendered a decree of foreclosure, in the usual form, against all the land, except the south-west quarter of the south-west quarter of section 27, patented to Moore, and dismissed the bill as to him and as to said tract. Prior to the rendition of this decree, and on April 8, 1868, Thomas J. Bunn and wife, by their deed, conveyed all said land to Robbins, which said deed was recorded November 10, 1868. On appeal of Robbins to this court, the decree in the case of *Robbins* v. *Bunn et al.*, before mentioned, was reversed, and the cause remanded, this court holding that the decision of the Secretary of the Interior was conclusive as to Moore, and that Robbins was entitled to a decree against the whole of the land. (*Robbins* v. *Bunn et al.* 54 Ill. 48.) Without further action in the State courts, Moore and Davis, by writ of error, took the case to the Supreme Court of the United States, where the writ was dismissed for want of jurisdiction, that court holding there was no final judgment in this court. (18 Wall. 588.) In the meantime, the cause was re-docketed in the circuit court of DeWitt county, and such pro-

ceedings had, that on March 17, 1874, a decree was entered in favor of Robbins, in accordance with the opinion of this court. Moore and Davis appealed from that decree to this court, and the decree of the court below was affirmed. Moore and Davis then sued out a writ of error from the Supreme Court of the United States to this court, on which writ of error the judgment of this court was reversed, and the entry of Bunn held to be invalid and the entry of Moore and Mitchell good. (6 Otto, 530.) On the remanding order being filed, this court reversed its former ruling and the decree of the circuit court, and remanded the cause. Prior to the entry of the decree last mentioned in the circuit court, and on March 7, 1874, a patent was issued by the United States to Thomas J. Bunn for all of said land, being the south half of the south-east quarter and the south half of the south-west quarter of said section 27, and on May 16, 1874, Thomas J. Bunn and wife, by their quitclaim deed, conveyed all their right and title in the premises to Robbins.

On December 25, 1874, Mitchell died, leaving a widow and three children, his only heirs-at-law. Mitchell was at no time made a party to the bill of Robbins, or in anywise connected of record with that litigation. After the decision of the Supreme Court of the United States holding the Mitchell entry valid, and on March 3, 1879, Clifton H. Moore and Vespasian Warner procured a quitclaim deed from the widow and heirs of Mitchell for the south half of the south-east quarter of said section 27.

Before the purchase by Moore and Warner, March 3, 1879, Robbins borrowed of William L. Gilbert and Henry Gay $500, and to secure the payment of the same, made, executed, acknowledged and delivered his deed of trust to Hudson Burr, trustee, on the said south half of the south-east quarter of section 27, which loan matured May 1, 1879, with interest. The date of this trust deed from Robbins to Burr, was April 30, 1878, and which was recorded the same day.

August 6, 1879, Davis filed his cross-bill, seeking to set aside the patent to Bunn as to the south-east quarter of the south-west quarter of said section 27. September 11, 1879, Moore and Warner obtained leave of the court to intervene and answer, and also to file their cross-bill. On the day following, (September 12,) Robbins amended his bill by striking out so much thereof as pertained to the south half of the south-east quarter of section 27, leaving only so much of the bill as sought to foreclose said mortgage on the south half of the south-west quarter of section 27. The effect of this amendment was to leave in controversy the south-west quarter of the south-west quarter of section 27, patented to Moore, and the south-east quarter of the south-west quarter,—the tract claimed by Davis.

On October 1, 1879, Moore and Warner filed their cross-bill, in which they charge that Mitchell was never made a party to the original bill, and never appeared in the cause; the conveyance, by his widow and heirs, to them, of the eighty acres, the south half of the south-east quarter of said section 27, and showing the invalidity of the Bunn title, and praying that the title and interest held by each of the respondents to said tract might be conveyed to them, and that all deeds and patents purporting to convey said eighty-acre tract of land to Bunn, and from him to the other defendant, etc., be cancelled and set aside. The answer of Robbins to this cross-bill, among other things, set up in defense the twenty-years' Statute of Limitations, possession and payment of taxes under color of title for seven successive years, and the declarations and statements of Mitchell in his lifetime, whereby Robbins was induced to purchase from Bunn, etc., as an equitable estoppel, and also that said Mitchell had made a deed to Bunn, which was alleged to have been lost or destroyed. The answer of Gilbert and Gay adopts the answer of Robbins as their own, and sets up in addition their loan to Robbins and his deed of trust on the premises securing the same, in good faith relying upon the

record and possession by Robbins, and their right to foreclose as against Robbins, etc.

On the hearing, December 15, 1882, Robbins dismissed his original bill. Thereupon the respondents to the cross-bill of Davis came into open court and admitted the right of Davis to the relief asked therein, and a decree was rendered on the cross-bill of Davis accordingly, affecting only the south-east quarter of the south-west quarter of said section 27. The cause was then heard on the cross-bill of Moore and Warner as to the eighty acres the south half of the south-east quarter of section 27, the answers of Robbins, Gilbert and Gay thereto, replications, and the proofs, from which the court found all the material allegations of said cross-bill to be true, and rendered a decree setting aside the patent to Bunn for said tract of land, as having been illegally and fraudulently obtained, and ordered respondents, Robbins, Gilbert and Gay, to convey all their interests in said land to Moore and Warner, and that Robbins pay the costs. Robbins, Gilbert and Gay bring the case to this court by writ of error, and seek to reverse the decree of the court below so far as it rendered relief upon the cross-bill of Moore and Warner.

Messrs. WILLIAMS, BURR & CAPEN, for the plaintiffs in error:

If a party makes a declaration or does an act to induce another to do an act he would not otherwise do, or to invest his money on the faith of such declaration or act, he will be estopped to deny the truth of his declaration or just effect of his act. *Hefner* v. *Vandolah,* 57 Ill. 520 ; *People* v. *Brown,* 67 id. 435 ; *Smith* v. *Newton,* 38 id. 230 ; *Mills* v. *Graves,* id. 455 ; *Wade* v. *Bunn,* 84 id. 117 ; *McConnell* v. *People,* id. 583.

Twenty years' adverse possession gives title. Rev. Stat. chap. 83, sec. 1.

Seven years' possession under color of title, in good faith, and payment of taxes, gives title. Rev. Stat. chap. 83, sec. 6.

Seven years' payment of taxes under color of title to vacant land gives title. Rev. Stat. chap. 83, sec. 7.

The Statute of Limitations runs against any one who has such a title as can· be asserted in an action of ejectment. *Dillingham* v. *Brown,* 38 Ala. 311; *Jones* v. *Borden,* 5 Texas, 410; *Moody* v. *Fleming,* 4 Ga. 115.

A mortgagee claiming to be the owner, and paying taxes as owner, is paying under color of title. *McClennan* v. *Kellogg,* 17 Ill. 498; *Hardin* v. *Gouveneur,* 69 id. 140; *Bride* v. *Watt,* 23 id. 507; *O'Neal* v. *Boone,* 53 id. 35; *Cofield* v. *Furry,* 19 id. 183; *Chickering* v. *Failes,* 26 id. 504.

Robbins was clearly paying these taxes in his own right.

The mortgage before the patent, was good to pass the fee. *Marks* v. *Dickinson,* 20 How. 501.

That a person may purchase of a party in possession having a perfect title of record, and be protected against a secret equity, is a doctrine so familiar as not to need authorities in its support; but nevertheless we will cite a few: *Brainard* v. *Hudson,* 103 Ill. 218; *Moore* v. *Hunter,* 1 Gilm. 317; *Prevo* v. *Walters,* 4 Scam. 35; *Dickerson* v. *Evans,* 84 Ill. 451; *Slattery* v. *Rafferty,* 93 id. 277; *Pitman* v. *Sofley,* 64 id. 165; *Ogle* v. *Turpin,* 102 id. 148.

Messrs. MOORE & WARNER, *pro se:*

Our first point is, that Robbins can not now set up a claim so different and adverse to the one which he has sought, by ten years of litigation, to establish. He is estopped by his own acts from asserting any other or different title. He furnished Moore, Warner and Davis with the information upon which they acted and relied upon. Appellees had a right to presume that Robbins had no other title to the land but that of his mortgage which he was seeking to foreclose, and he can not now set up any other title acquired before the commencement of this litigation. Bigelow on Estoppel, 475, 476-480; *Bocock* v. *Pavely,* 8 Ohio St. 270; *Hutchins* v. *Smith,* 46 Barb. 235.

Robbins elected to claim under his mortgage. His conduct induced the belief that he had no other title,—claimed by no other title. Bigelow on Estoppel, 578; *Conklin* v. *Smith,* 7 Ind. 107; *Douglas* v. *Scott,* 5 Ohio, 197; *Dewy* v. *Bell,* 5 Allen, 165; *Breeding* v. *Stamper,* 18 B. Mon. 175; *Byrne* v. *Morehouse,* 22 Ill. 603; *Pinckard* v. *Milmine,* 76 id. 453; *Cook* v. *Hunt,* 24 id. 535.

Robbins, after the death of Mitchell, could not be a witness in his own behalf. Rev. Stat. chap. 51, sec. 2.

Robbins kept his mouth closed, while Mitchell was alive, as to the then facts that he now relates, Mitchell's deed, conversation, and the passive possession of the land since the Bunn entry. The court will not allow him to open it now. *Loyd* v. *Lee,* 45 Ill. 277; *Brooks* v. *Record,* 47 id. 30; *Kane County* v. *Herrington,* 50 id. 232.

For the kind of possession required for twenty years, we refer the court to *Rockwell* v. *Servant,* 63 Ill. 424; *Fairman* v. *Beal,* 14 id. 244; *Turney* v. *Chamberlain,* 15 id. 271; *Ambrose* v. *Raley,* 58 id. 506, and cases cited; *Kerr* v. *Hitt,* 75 id. 51; *Clark* v. *Lyon,* 45 id. 388; *Bristol* v. *County of Carroll,* 95 id. 84; *Foster* v. *Letz,* 86 id. 412; *Coleman* v. *Billings,* 89 id. 183; *Weaver* v. *Wilson,* 48 id. 125; *Medley* v. *Elliott,* 62 id. 532; *Jackson* v. *Berner,* 48 id. 203, and cases cited; *McClellan* v. *Kellogg,* 17 id. 498; *Spellman* v. *Curtenius,* 12 id. 409; 2 Story's Eq. p. 991, sec. 1521.

In view of the decisions in *Moore* v. *Robbins,* 6 Otto, 530, *Turney* v. *Chamberlain,* 15 Ill. 271, and *Thompson* v. *Prince,* 67 id. 281, Bunn's possession was an intrusion, and does not aid Robbins in his possession. Moore's patent is dated February 1, 1859. The patent to Bunn was still later. Any possession of these lands previous to the date of the patents helps no one. The government had the title, and it was troubling more than one officer to decide between the claimants.

The possession of the mortgage assigned, coupled with the effort to foreclose it, did not constitute claim and color of

title, under our statute. *Morrison* v. *Norman,* 47 Ill. 477; *Bennett* v. *Matson,* 41 id. 332; *Irving* v. *Brownell,* 11 id. 402; *Bride* v. *Watt,* 23 id. 507.

It must be a writing purporting to convey the title to the land. Robbins, until he got his deed from Bunn, had no paper title. True, he had the note assigned to him, and the mortgage by T. J. Bunn to Lewis Bunn was delivered to him, and he was trying to foreclose, and get either his money or the land. Even Bunn had no claim and color until he received his patent. *Rigor* v. *Frye,* 62 Ill. 507; *O'Neal* v. *Boone,* 53 id. 35; *Woodward* v. *Blanchard,* 16 id. 424; *Rockwell* v. *Servant,* 63 id. 424; *Pratt* v. *Pratt,* 6 Otto, 704; *Cook* v. *Norton,* 48 Ill. 20; *Grantham* v. *Atkins,* 63 id. 359; *Emmons* v. *Moore,* 85 id. 304.

Per CURIAM: The original bill of Robbins was filed April 17, 1866, to foreclose the mortgage from Thomas J. Bunn and wife to Lewis Bunn, on the south half of the south-east quarter and the south half of the south-west quarter of section 27, town 19 north, range 3 east. Thomas J. Bunn and wife, the mortgagors, Clifton H. Moore, and, subsequently, David Davis, were alone made parties defendant. Mitchell, who had purchased, at the land sale, the south half of the south-east quarter, and also the south-east quarter of the south-west quarter, was not made a party thereto. Moore was then claiming the south-west quarter of the south-west quarter of said section by virtue of his entry thereof, and Davis the south-east quarter of of said south-west quarter under his purchase of the title of Mitchell therein, both claiming adversely to the Bunn title, under which Robbins claimed.

On March 7, 1874, a patent was issued by the United States to Bunn for all of said land,—that is, for one hundred and sixty acres,—described as the south-half of the south-east quarter and the south half of the south-west quarter of said section 27, and he having, by deed of himself and wife, on the

8th day of April, 1868, conveyed all of said land to Robbins, on the 16th day of May, 1874, again conveyed the same to said Robbins, thereby vesting in him (Robbins) the legal title, as shown by the record, to all of said land, except the south-west quarter of the south-west quarter of section 27, which had also and previously been patented to Moore. Mitchell died December 25, 1874.

On April 30, 1878, Robbins conveyed the tract described as the south half of the south-east quarter of section 27, to Hudson Burr, in trust, to secure a loan of $500 from Gilbert and Gay to Robbins. At that time the public records showed a complete title in Robbins to this eighty-acre tract, and he was in the actual possession of the same, claiming title thereto. However, on the 3d of March, 1879, substantially a year after the execution of the trust deed to secure the indebtedness from Robbins to Gilbert and Gay, the widow and heirs of Mitchell conveyed said eighty-acre tract to Clifton H. Moore and Vespasian Warner, who, on September 11, 1879, obtained leave of court to intervene and file a cross-bill in said cause. On the next day, September 12, 1879, Robbins dismissed his bill as to said tract in the south half of the south-east quarter of section 27, being the tract now in controversy, and by his amended bill thereafter sought to foreclose said mortgage as to the other eighty-acre tract, being the south half of the south-west quarter of said section.

The cross-bill of Moore and Warner was subsequently filed, October 1, 1879, making Burr, Gilbert and Gay and Davis, as well as Robbins and Bunn, parties defendant, and sought to set aside the patent to Bunn, his deed to Robbins, and his deed of trust to Burr, to secure Gilbert and Gay, as being in fraud of the rights of the cross-complainants. It will be observed, that at the time of filing this cross-bill the tract now in controversy (that is, the south half of the south-east quarter of section 27,) was not involved in the litigation, Robbins having, by the amendment of September 12, 1879, dismissed his bill so far

as it related to that tract. It is also to be observed, that up to the time of filing said cross-bill, neither Mitchell, nor any one claiming title to that tract of land through or under him, had been made a party to the proceeding, nor had there been an assertion of any claim or interest under his entry. On the hearing, Robbins dismissed his original bill, and the cause proceeded to hearing on the cross-bills of Davis, and of Moore and Warner. Decree was rendered, by consent, in favor of Davis, and as he has no interest, and claims none, in the south half of the south-east quarter of section 27, the only land left in dispute, his cross-bill need not be further noticed. The case then stood, at the hearing, as if the cross-bill of Moore and Warner was an original bill, seeking to avoid the Bunn patent, and conveyances thereunder, as clouds upon the title of Moore and Warner to the south half of the south-east quarter of section 27, and to compel the conveyance of the legal title from Robbins to them.

The rights of Gilbert and Gay were acquired without notice, either actual or constructive, of an infirmity in Robbins' title. As before said, the public records showed that Robbins had the absolute title to the land included in the trust deed to Burr. No legal proceedings had been instituted to set the same aside, nor had it in any way, so far as it affected this tract of land, been called in question in said foreclosure proceeding at the time they made the loan to Robbins on the security of his apparent title. As has been seen, the cross-bill of Moore and Warner was not filed until long after the loan and trust deed were made. It is to be remembered, that until after the making of a trust deed to secure the loan to Robbins, by Gilbert and Gay, neither Mitchell, nor any one claiming title to the lands now in controversy, (*i. e.*, the south half of the south-east quarter of section 27,) had been made party to the litigation, nor had, in any of the pleadings or proceedings in said cause, any claim of Mitchell adverse to the Robbins title been asserted.

Robbins became the assignee of the note given by Thomas W. Bunn to Lewis Bunn, in the spring of 1862, and when Lewis Bunn conveyed the land to him, April 8, 1868, there was a merger of the two interests, and there was thereafter no mortgage to be foreclosed. By the mortgagor's deed of his equity of redemption to the holder of the mortgage debt, the relation of mortgagee and mortgagor was terminated, and the bill to foreclose was thereafter properly dismissed. Robbins was already the absolute owner of all the title the mortgagee or mortgagor had, and as there were no intervening rights to be cut off, a foreclosure could give him no additional title. The attempt of Robbins to foreclose this mortgage could not operate as notice to Gilbert and Gay, of an adverse claim of another who was not a party, and who was in no way connected with Robbins' title. It is true that Robbins, in his bill, asked to have Moore's title to the south-west quarter of the south-west quarter of section 27 set aside; but no mention is made of any adverse claim to the tract of land upon which Gilbert and Gay took their security. The object of that bill was, as we have seen, to foreclose the Bunn mortgage, which, at the time of the loan by Gilbert and Gay, had become merged in the legal title in the holder of the mortgage, and not a bill to remove as a cloud an adverse legal or equitable title to the land in question. It can not be seriously contended that the issue of the patent to Moore for a different forty was notice to Gilbert and Gay of the rights of Mitchell to the eighty-acre tract in litigation. Gilbert and Gay having acquired the deed of trust securing their loan, without notice of any adverse claim to them, occupied the position of *bona fide* purchasers. 2 Pomeroy's Eq. 767.

The law is well settled that a *bona fide* purchaser of the legal estate will be protected against the prior equitable title of another of which he had no notice. (2 Pomeroy's Eq. 740.) This court has frequently announced this rule, and applied it. In *Spicer* v. *Robinson*, 73 Ill. 519, it was held that where a con-

veyance was made to defraud the grantor's creditors, an innocent purchaser for value, without notice of the fraud, would be protected. In *McNab* v. *Young*, 81 Ill. 11, it was held, that where the legal title to land is vested in a party, and there is nothing appearing from which a purchaser may know there was fraud in the acquisition of such title, or any invalidity in the deeds constituting the chain of title, he will be protected in his purchase. (See, also, *Gavagan* v. *Bryant*, 83 Ill. 376; *Dickerson* v. *Evans*, 84 id. 455.) So a purchaser of land who has no notice of any irregularity in the proceedings by which his vendor acquired title, will be protected. (*Jenkins* v. *Pierce,* 98 Ill. 646; *McHany* v. *Schenk*, 88 id. 357.) So a purchaser of land who has no notice that his grantor's deed is but a mortgage, will be protected. (*Jenkins* v. *Rosenberg*, 105 id. 157.) So, although the grantee in a deed may hold the legal title in trust for another, a third person may acquire the title from the trustee, if he has no notice of the trust, and acts in good faith. *Emmons* v. *Moore*, 85 Ill. 304; 2 Pomeroy's Eq. 770. See, also, *Peck* v. *Arehart*, 95 Ill. 158; *McDaid* v. *Call*, 111 id. 298; *Bradley* v. *Loose*, 99 id. 234.

A purchaser is presumed to have notice of any defect of title apparent on the face of his title papers, or by the record, and will be required to take notice of the title or claim of persons in possession, but is not required to look for latent defects in the chain of conveyances, when regular on their face, and apparently conveying the legal title. (*Dickerson* v. *Evans*, 84 Ill. 455; *Moore* v. *Hunter*, 1 Gilm. 317.) We are of opinion, therefore, that as at the time Gilbert and Gay took their deed of trust the record showed a perfect title in Robbins, and there was nothing to indicate any adverse equitable interest in Mitchell or his heirs, and Robbins being in the actual possession of the land, and Gilbert and Gay having no notice, either actual or constructive, of any claim adverse to the title of Robbins, should, in equity, be protected to the extent of their mortgage interest, independently of whether the paramount

title to this eighty-acre tract of land should be held to be in Robbins or not. It is shown that Mitchell knew of the purchase of Robbins from Bunn, and that the record showed Robbins to be the owner of the land; yet, as has been seen, he at no time sought to intervene in the pending proceeding, or asserted any right adverse to the Robbins title. He thus permitted, with full notice thereof, Robbins to be clothed with the apparent legal title, and to continue for many years in the undisturbed possession of the land, without taking any steps to protect those who might deal with Robbins upon the faith of such legal title and possession. Under these facts, when taken in connection with the affirmative facts hereinafter set forth, he and those claiming under him, should be estopped, in equity, from asserting their title, either legal or equitable, as against Gilbert and Gay, who, as we have seen, loaned their money upon the faith of such title, in good faith, and without notice of any adverse claim.

It remains to consider the errors assigned by Robbins. The defense set up by him was the Statute of Limitations: First, of twenty years; and second, seven years; that Mitchell, in his lifetime, quitclaimed, for a valuable consideration, the land to Thomas J. Bunn, and that the grantees of Mitchell are, by the acts of Mitchell inducing Robbins to purchase of Bunn, estopped from asserting title deraigned from said Mitchell.

*First*—In respect of the defense of twenty years' limitation, it is sufficient to say, that the proof fails to show possession of the land by Robbins for the necessary period. He took possession in 1856 or 1857, by breaking about thirty acres of the eighty-acre tract in question, and sowed it in wheat. The land was not fenced. There was, however, a shanty on the same or the other eighty-acre tract before mentioned,—which, is not definitely shown. After this wheat crop was harvested no other acts of possession are shown until 1871, (a period of fifteen years,) when one Haynie again broke the land. It is not shown that either Bunn or Robbins was in possession

during the period named, and if they had not abandoned it, their possession was not of that open, notorious and exclusive character which the law requires in such cases, and so we hold that the defense of twenty years' adverse possession was not maintained.

*Second*—The defense of seven years' possession and payment of taxes, under claim and color of title, can not be maintained. Robbins first acquired color of title by the deed of Bunn and wife to himself, April 8, 1868. Prior to that time he held simply the note and mortgage given by Thomas J. to Lewis Bunn, assigned to himself, which was, as it purported to be, simply the evidence of, and security for, the payment of money. It did not purport to convey title. It is true Robbins paid taxes for seven successive years,—from 1863 to 1869, inclusive; but for five of these years he had no color of title, so that the payment of taxes, prior to his deed in 1868, was unavailing to create a bar. Nor, as we have seen, does it appear that he was in possession of the land during any of said years.

*Third*—The two other defenses may be considered together, and present questions of no inconsiderable difficulty. Both present questions of fact, which necessarily involve a somewhat extended consideration of the evidence.

Robbins testifies that he was not satisfied to purchase of Bunn until he had first seen Mitchell; that he saw Mitchell, and inquired of him if he (Mitchell) had any claim upon the land; that Mitchell replied that he had had a suit with Bunn about it, and that Bunn had beat him out of it, and that he had told Bunn if he would pay up the costs in the suit, he (Mitchell) would make him (Bunn) a quitclaim deed to the land at any time; that he did not consider he had any further claim to the land, and for him (Robbins) to go on and buy the land of Bunn; that he would make Bunn a quitclaim deed to the land any time he called on him for it. He testifies that on the same or the next day he met Bunn at Wis-

mer's office, in Bloomington; that Wismer advised that the mortgage from Thomas J. to Lewis Bunn on this land for $1000 had better be assigned to the witness, and then foreclosed, and the title got in that way. He further testified: "I told him (Wismer) what Mitchell had said, and he thought that Bunn had better get a quitclaim deed from Mitchell. Mr. Bunn had to come to Bloomington for the note and mortgage, or send for it, and the next day Bunn and I met at Wismer's office. He (Bunn) had the note and mortgage, and had got the quitclaim deed from Mitchell, and had all the papers there. The quitclaim was signed by John T. Mitchell and his wife. It was for all the land he claimed any interest in. I examined and read the deed myself. The deed was made to Thomas J. Bunn. After looking over the papers, Mr. Wismer concluded that this deed wasn't necessary. We could go on and foreclose under the mortgage. My best recollection is, Bunn said to Wismer, "What do we want with the deed?' Wismer said it wasn't necessary, and Mr. Bunn tore it up and threw it into the stove. Wismer said, 'You may as well destroy it. It don't cut any figure as long as Mitchell had acknowledged he had been beaten in the suit, and had no further claim on it.' This all occurred before I paid him the money. T. J. Bunn did not make me any deed at that time. In my conversation with Mitchell, I told him I didn't feel satisfied to pay any money until I had seen him and had a talk with him. He (Mitchell) then said, that so far as he was concerned he didn't consider he had any claim on the land, but he had told Bunn, if he would pay the costs in the suit he would make him a quitclaim deed at any time, and if I made a trade with Bunn it would be all right—that the land belonged to Bunn." On cross-examination, he testified that he took the deed mentioned, in his hands, and read it, but could not recollect before whom it was acknowledged, and that Wismer, Bunn and himself were then present; that it was a day or two after he had a talk with Mitchell that he concluded the pur-

chase; that Bunn destroyed the deed, and repeated substantially the testimony upon the examination in chief.

Thomas J. Bunn, a banker of Bloomington, testified: "I sold Robbins the land I pre-empted in DeWitt county. I think it was about 1855 or 1856. Won't be positive about the time. My recollection was, the sale was for about $800. He paid me the money. We consulted with Mr. Wismer, I think, about the title. My recollection is, that Wismer advised Robbins to have a quitclaim deed from Mitchell. Mr. Mitchell was in the office, and the matter was talked over. The substance of the conversation was, he had no objection to giving the quitclaim deed, or was willing to give it. My recollection is, that Mitchell made the proposition that I pay the costs in the contest between him and me about this land, and that my father paid the costs. The settlement with Mitchell in regard to the matter was made with my father. My recollection is, that Mr. Mitchell made the quitclaim deed either to Robbins or to my father, don't remember which—think it was Robbins. Don't think I ever had a deed myself—think it was among the papers when Robbins and I finally closed the trade. My recollection is that I saw it. I have no recollection of examining the deed at all. Do not know what became of it." On cross-examination he testified: "Mitchell was in Wismer's office at the time the trade was being closed, and was talking about the quitclaim deed. Do not remember whether he was talking with me, or father, or Robbins,—perhaps to all of us. My recollection is, that the deed was made at the time the trade was closed, but perhaps not at the first conversation. Don't think I ever read the deed myself. It was in Wismer's hands, with other papers, when the trade was closed. All I know about it was what Mitchell said. I saw the deed, but did not read it. Saw the outside—perhaps the inside. My recollection is, the trade was closed when Mitchell was in the office. The papers were all made out conveying the property, and left in Wismer's hands. I think the sale, in the first

place, was of the note and mortgage. Don't remember whether I made him a deed for the land then, or not. I turned over to Robbins the note and mortgage, and the deed, if there was one made by me. Have seen none of the papers since. I have no knowledge of any of them being destroyed in my presence. If I made a deed to Robbins at the time of the trade, I have made him two. Can't tell when the last one was made,—may be six or seven years ago. Don't recollect that Wismer ever advised that any of the papers be destroyed. At that time I had made no deed to the land. Don't think I ever paid Mitchell any money—think the matter was settled between him and father. My recollection is, we were all day making the trade, and Mitchell was in and out several times. The talk about the deed was before the trade was closed. My recollection is, that the trade with Robbins was a sale of the land to him by turning over the note and mortgage to him, and that whatever was necessary to be done to make the transfer of my interest in it, or my father's interest, was done, and that was why I thought some deed was made by me or my father at the time. I had no patent at that time, and other parties were claiming the land. It may be possible that the only transfer made at the time was the note and the mortgage. We intended to convey to Robbins all the interest we had. Am not sure there were any other papers transferred besides the note and mortgage." On re-direct examination he said: "Mitchell knew Robbins was buying the land. We were talking about it in his presence. Wismer was satisfied to advise Robbins to buy the land if Mitchell gave a quitclaim deed, and Mitchell was willing to give a deed. He didn't care about fighting the matter further. Mitchell made the statement as I stated in my evidence, and Wismer advised Robbins, after Mitchell made the quitclaim deed, that there were no objections to it, and for him to close the trade. The conversation I heard between Mitchell and whoever he was talking to, was in Wismer's office, in the presence of Robbins and myself, and I

4—129 Ill.

think father was present. The result of the conversation was that Mitchell made and delivered (I saw the paper then) his deed releasing his interest to Robbins. This was before the trade was concluded." He further testified: "I did not see Mitchell or his wife execute any papers, but did see, in Wismer's hands, a paper purporting to be a deed from Mitchell and his wife, and which Wismer said was a satisfactory release of his interest. I don't recollect whether I saw the inside of it or not. Don't remember whether I had it in my hands or not."

Lewis Bunn testified, in substance, that Mitchell spoke to him about being tired of fighting about the land, and that so far as he was concerned, he was willing to make a quitclaim deed and quit fighting. "We were manufacturing plows, and he was doing business for us. He said he had some $200 or $300 costs to pay in the land litigation. I settled some bills of costs. Can't tell whether there came a bill for his costs. * * * There was a conversation between us, (Mitchell and I,) that he must not be offended with me on account of any complication between him and my son. He said he was tired of fighting the land; that he was willing to make a quitclaim deed to any person they wished it to be made to. That was the purport of it."

On the other hand, Elizabeth Mitchell, widow of John T. Mitchell, testified, that her husband told her that he had entered the land known as the Bunn pre-emption. "Soon afterwards another man built a shanty on it. Forget his name. There was trouble about it. Moore had litigation and Mitchell had litigation, but he dropped it to see how Moore would come out; then he would know what to do with his. Heard my husband say, not more than two weeks before he died, that he expected to get the land. Never said anything to me about having made a deed to this land, or that he did not own it. I never joined with him in making a deed to this land. We made no deed." On cross-examination she testified: "I have

an interest in this suit, in getting it for my children. Don't know whether it will come to me or my children. Husband entered a great deal of land. Sold some. Don't remember every deed I have signed. When I signed deeds I knew what I signed. Can't tell how many I have signed. Can't guess. Can't give a list of lands for which I have made deeds."

William T. Mitchell testified that he heard his brother, John T. Mitchell, often speak of this land, and claimed to own it. He said he expected to gain the land.

John E. Rasbach testified that he had heard Mitchell talk about the land; that he said he would wait and see how Moore came out with his claim before he would push his (Mitchell's) claim. The last time he heard him speak about it was in the summer prior to his death.

John H. Mitchell, a son of said John T., testified that his father always claimed to own the land. He spoke of it a month before he died, and said he expected to get the land,— that Moore had advised him to wait and see if he gained his case.

Clifton H. Moore testified, that about the time Robbins was buying the Bunn note, Mitchell came to him and said that Bunn, or Bunn and Robbins, wanted him to release or quit-claim to them, and wanted to know what effect that would have upon his getting his money back from the government— the money he had advanced for the entry of the land; that the witness told him if he conveyed to any one else he could not get his money; that Mitchell assured the witness he would not convey the land without consulting him, and that he always claimed the land.

We have thus given the evidence substantially at length, as it is found in this record. We can not say that it is sufficient to justify this court in finding differently from the court below, upon the question of the execution and delivery of the deed from Mitchell. It will be observed that Robbins says the deed was to Thomas J. Bunn. Thomas J. Bunn, while having no

recollection of having examined the deed, thinks it was made to Robbins or to Lewis Bunn. Lewis Bunn does not speak of having seen the deed at all. Neither of the Bunns corroborates Robbins as to Wismer's advice to get the deed or to destroy the same. If Mitchell had, in fact, made such a deed, it is strange that any lawyer should advise its destruction, and that Mitchell should have claimed the land up to the time of his death. It is not shown or pretended that there was any reason for the destruction of the deed, or that there were liens against the property of Mitchell which would make it desirable to avoid acquiring title through him. Again, Robbins testifies that the deed was signed by Mrs. Mitchell, while she positively denies having executed any such deed. It is clear, however, from the testimony of Robbins, the two Bunns, and Moore, that the subject matter of the release or conveyance of Mitchell's claim was considered and talked over between Mitchell, Robbins and the Bunns, at about the time of the purchase by Robbins.

While the evidence supporting the contention of Robbins is not so clear, consistent and convincing as to justify us in holding that Mitchell made and delivered the deed mentioned by Robbins, yet it is sufficient, we think, to show that Mitchell did inform and assure Robbins that he had given up his claim upon the land, and for Robbins to go on and purchase the same of Bunn. The testimony of Robbins to this fact is clear and explicit, and is fully corroborated by the testimony of the two Bunns, and to some extent, at least, by that of Moore, as well as by the circumstances of the case. The contest before the government land office had been decided by the Secretary of the Interior adversely to Mitchell, and he was unwilling to further litigate his claim. The testimony of the Bunns fully substantiates this fact. There can be no question, from the testimony of Robbins and the two Bunns, that he was willing to convey his interest in the land, if he had any, if Bunn would pay the costs already made in the contest before the depart-

ment, and Lewis Bunn testifies that he paid such costs, and there is no evidence contradicting him. His conference with Moore shows, as already stated, that his conveyance of his interest, whatever it might be, had been the subject matter of negotiation between himself and Robbins or Bunns; and if he did not convey, as we must hold, it was because he feared that thereby his right to recover back the money advanced to the government upon his attempted entry of the land might be defeated. It is barely possible that this suggestion of Moore, that a conveyance by Mitchell would defeat this right of repayment by the government, may furnish a clew to the destruction of the deed by Mitchell, if one was made. It would be readily understood that a purchase by Robbins, after complete and full disclaimer of any interest by Mitchell, would operate by way of estoppel upon him to assert his title against one who had been induced to purchase by reason thereof, and that therefore the deed would operate simply to the prejudice of Mitchell, without really being of substantial benefit to Robbins. But, as we have said, while there is a strong probability that a paper purporting to be a deed was present at the time of the trade between Thomas J. Bunn and Robbins, we can not, for that reason, as already stated, reverse the decree.

It is, however, said, that the element of fraud in the statements made by Mitchell to Robbins, and by which he was induced to purchase, is wanting,—that they were made in good faith, with no improper motives, and that the doctrine of equitable estoppel does not therefore apply. In our judgment the testimony establishes the fact that Robbins purchased relying upon the disclaimer by Mitchell of any interest in this land— of his willingness and desire to no farther contest the title of Bunn. It is shown, and not disputed, that Robbins knew of the agreement by which Bunn was to pay the costs of litigation, and that Mitchell was to waive and release any interest in the land, and quitclaim at any time, or to. such person as the Bunns might desire, any interest he might have therein.

It is a misapprehension to suppose that the doctrine of equitable estoppel arises only when the representation has been fraudulently made. It is true, that if the element of fraud is wanting there can be no equitable estoppel; but it is well settled that a fraudulent result suffices for the application of the doctrine. In *Davidson* v. *Young*, 38 Ill. 145, LAWRENCE, J., quotes from 2 Story's Eq. 1543, the rule, as follows: "The doctrine of *estoppels in pais*, or equitable estoppel, is based upon a fraudulent purpose and a fraudulent result. If, therefore, the element of fraud is wanting, there is no estoppel,—as, if both parties were equally cognizant of the facts, and the declaration or silence of the one party produced no change in the conduct of the other, he acting solely upon his own judgment. There must be deception, and change of conduct in consequence, in order to estop a party from showing the truth." In *Flower* v. *Elwood*, 66 Ill. 447, the rule is thus stated: "To conclude a party by an equitable estoppel or an *estoppel in pais*, there must be a fraudulent purpose of the party against whom it is applied, or his acts must produce a fraudulent result; and there must be a change of conduct induced by the acts of the party estopped, to the injury of another, in order to prevent him from showing the truth. If the element of fraud or injury is wanting, there is no estoppel." To the same effect, see *Chandler* v. *White*, 84 Ill. 435, and *Mayer* v. *Erhardt*, 88 id. 452.

In *Hill* v. *Blackwelder*, 113 Ill. 283, this court said: "It is said that there can be no estoppel if the element of fraud is wanting, and that there was here no fraudulent intention on the part of Harris. No fraudulent intention is required. It is enough if there would be a fraudulent effect from the evidence attempted to be set up. To allow Harris to invalidate this redemption and execution sale, as he here seeks to do, would be to permit the perpetration of a gross fraud and injustice upon Dresser. To prevent this, arises the equitable estoppel." In the same case it was held, that where the foundation of the estoppel is in silence, and omission to give notice of existing

rights, the party relying on the same must not have had the means of ascertaining the true state of the title by reference to the public record, but that such rule does not apply to a case where the land owner has actively encouraged and induced the injured party to act. In the latter case, the party making the declaration acted on will be estopped, although he may have been ignorant of his true rights. The other party may rely on his representations without further inquiry, and act upon the assumption that he is cognizant of his rights, and knows the condition of his own title. So the doctrine is, if the owner of land stands by and suffers credit to be given to another on the supposition that he owns the land, and aids in creating the belief that such other person does own the same, he can not be afterwards heard to assert his own title as against such creditor. *Higgs* v. *French*, 14 Ill. 344. See, also, *Tucker* v. *Conwell*, 67 id. 552; *International Bank* v. *Bowen*, 80 id. 541. So where a former owner of lots executed a deed in blank, when applied to for information as to the title by a party about to purchase the same disclaimed any title in himself, and stated that the person proposing to sell was the owner, and upon this assurance the purchase was made, it was held that these facts constituted a complete estoppel in equity against the original owner, and that he could not assert title as against the purchaser. *Wade* v. *Bunn*, 84 Ill. 117. See, also, *Curyea* v. *Berry*, 84 Ill. 600; *Wilmington Star Mining Co.* v. *Allen*, 95 id. 288.

The above cases are similar in principle to the one now before us, and illustrate the rule sought to be applied. Many others determined by this court may be found equally applicable, and announcing the same doctrine, and we have not thought it necessary to cite the text writers or adjudications of other courts, which will, however, be found to be in harmony with the doctrine announced in the cases cited.

It is, however, claimed, that Robbins did not rely upon or act on the declarations and assurance of Mitchell that he had

abandoned his claim to the land and had no further interest or claim in or upon the same, and giving him to understand that a purchase from Bunn would convey a good title. It is evident that Robbins did rely on such statements of Mitchell. Robbins testifies that he was unwilling to buy of Bunn without first seeing him, and finding whether the contest as to Bunn's title was at an end. In this he is corroborated by both the Bunns. They had told him of Mitchell's arrangement in respect of the quitclaim deed from Mitchell, or his willingness to make the same, and the agreement of Bunns to pay the costs of the previous litigation, and of the fact of the payment. Yet, before any money is paid by Robbins,—before the trade is consummated,—we find Mitchell present in Wismer's office, in connection with the purchase of the land by Robbins from Bunn. We find him inquiring of his attorney as to the effect upon his rights to recover back his money from the government if he should make a deed as requested by Robbins or the Bunns. The fact that Robbins took the advice of an attorney does not show or tend to show that Robbins did not rely upon the statements of Mitchell. On the contrary, it clearly appears, both from the testimony of Robbins and Thomas J. Bunn, not only that Robbins relied upon the representation and statements of Mitchell, but also that the advice of the attorney was predicated thereon. It is shown, and not controverted, that the advice of the lawyer consulted was based upon Mitchell's disclaimer of any intention to further urge or prosecute his claim to the land, or to further contest Bunn's title. It seems, from the testimony, that the whole matter was gone over, and the contract considered in the presence of Mitchell, who, recognizing the agreement with Bunn, disclaimed any title or interest to any of the land involved in the previous litigation.

We are of opinion that the case falls clearly within the rule, and that Mitchell, if living, and those claiming by, through or under him, are estopped from asserting contrary to the representations thus made by Mitchell, upon the faith of which

Robbins parted with his money and acquired the title then in the Bunns.

No question is made as to the power of a court of equity to establish a title to real estate by estoppel against the former owner, who, by his acts and representations, has induced another to purchase from one holding under a void deed or patent, or if it should be, the jurisdiction is fully sustained by authorities. *Wade* v. *Bunn,* 84 Ill. 117.

It is insisted that, since Mitchell's death, Robbins is not a competent witness in respect of the representations and assurances of Mitchell, before referred to. The second section of the act relating to evidence is relied upon as establishing his incompetency. That section provides, that no party to a civil action, suit or proceeding shall be allowed to testify in his own behalf when the adverse party sues or defends as the heir, devisee or legatee, etc., of any deceased person, unless called by such adverse party. It is enough to say, that it does not appear, from the record, that the complainants in the cross-bill sue in any representative capacity. Moore and Warner, complainants therein, are not the heirs of Mitchell, but are purchasers from such heirs, asserting title in their own right. The first section of the same act makes all persons competent witnesses in civil proceedings, and to render Robbins incompetent, it must appear that he falls within some of the exceptions provided in the statute. We are of opinion that the objection to his competency was not well taken.

At the time of the purchase by Moore and Warner, and the conveyance by the heirs of Mitchell to them, Robbins was in the actual possession of the tract of land in litigation. Such possession was notice to Moore and Warner of his legal and equitable title.

It follows, from what has been said, that we are of opinion that the circuit court erred in decreeing that Robbins convey his title to Moore and Warner, and also in decreeing that Gilbert and Gay likewise convey, and holding that the com-

plainants in the cross-bill were entitled to the relief granted, and the decree must therefore be reversed, which is done, and the cause remanded to the circuit court, with directions to dismiss the cross-bill of said cross-complainants, Moore and Warner.                                        *Decree reversed.*

Mr. CHIEF JUSTICE CRAIG, dissenting.