## UNITED STATES v. MARTIN.

*(District Court, W. D. Virginia.    April 18, 1892.)*

1. INDICTMENT—VALIDITY—PRIOR REFUSAL TO INDICT.
   The fact that a grand jury has ignored an indictment is not a bar to the subsequent finding of a true bill for the same offense.

2. POST OFFICE—SEALED OBSCENE LETTER.
   Under Rev. St. § 3893, as amended by Act Cong. 1888, 25 St. p. 496, an obscene letter, sealed or unsealed, is nonmailable, the provision that no person shall open any sealed matter not addressed to himself being a sufficient protection to private correspondence. *In re Wahll*, 42 Fed. Rep. 822, followed.

3. SAME—OBSCENE LETTER DEFINED.
   A letter from a man to an unmarried woman, proposing a clandestine trip to a neighboring town, to return the next morning, he to pay her expenses and five dollars besides, is an obscene letter within the meaning of the act making such matter nonmailable, although it contains no words which are of themselves obscene.

4. SAME.
   "Obscene," within the meaning of the act, is that which is offensive to chastity and modesty. *U. S. v. Harmon*, 45 Fed. Rep. 414, followed.

At Law.    Indictment of George W. Martin for mailing obscene letters in violation of Rev. St. § 3893.    Heard on motion to quash and demurrer.    Overruled.

*W. E. Craig*, U. S. Atty.

*Peatross & Harris*, for defendant.

PAUL, District Judge.    In this case the defendant moves to quash the indictment on the ground that it was found by a grand jury of this court at Lynchburg in March, 1892, after a grand jury of this court at a court held at Danville in November, 1891, had reported the indictment "not a true bill."    I do not think this motion can be sustained either by the practice in Virginia or by the doctrine generally held by the American courts.    The doctrine in this state and the other American states is that the ignoring of an indictment by one grand jury is no bar to a subsequent grand jury investigating the charge and finding an indictment for the same offense.    "If a man be committed for a crime, and no bill be preferred against him, or if it be thrown out by the grand jury, so that he is discharged by proclamation, he is still liable to be indicted, though the sending up a second bill, after an *ignoramus*, is an extreme act of prerogative, subject to the revision of the court.    * * *"    Whart. Crim. Pl. & Pr. § 446.    The defendant also demurs to the indictment on the following grounds:    *First*, that the sending of an obscene, lewd, and lascivious letter under seal through the mail is not an offense under section 3893 of the Revised Statutes of the United States, as amended by the act of congress approved September 26, 1888, under which the indictment in this case was drawn; *second*, that the letters on which this indictment is based are not obscene, lewd, and lascivious within the meaning of the statute.

The court will consider these objections in the order in which they are made.    Prior to the enactment by congress (September 26, 1888) of the amended act on this subject, the word "letter" was not embraced

within its provisions. The statute (section 3893) provided that every obscene, lewd, or lascivious book, pamphlet, picture, paper, writing, print, or other publication of an indecent character should be nonmailable. On the construction of this statute the decisions of the courts touching a sealed letter of an obscene, lewd, or lascivious character sent through the mails were by no means harmonious. The difference in the decisions in the United States courts arose over the construction of the word "writing." A number of the decisions held that the word "writing" did not embrace private letters. An equal or perhaps greater number of the decisions held that it was the intention of congress to embrace within the meaning of the word "writing" letters of an obscene, lewd, or lascivious character, written by one person to another, as private correspondence. Of the cases the court has examined bearing on this question the following held that the term "writing" did not embrace private letters: *U. S.* v. *Williams*, 3 Fed. Rep. 484; *U. S.* v. *Loftis*, 12 Fed. Rep. 671; *U. S.* v. *Comerford*, 25 Fed. Rep. 902; *U. S.* v. *Mathias*, 36 Fed. Rep. 892. On the other hand, the following decisions held that private letters were embraced by the statute within the term "writing:" *U. S.* v. *Morris*, 18 Fed. Rep. 900; *U. S.* v. *Gaylord*, 17 Fed. Rep. 438; *U. S.* v. *Hanover*, Id. 444; *U. S.* v. *Britton*, Id. 731; *U. S.* v. *Thomas*, 27 Fed. Rep. 682. In this confused and conflicting condition of the decisions of the courts congress undertook, in the amended act of September 26, 1888, to legislate again upon this subject, and in the amended act inserted the word "letter," the omission of which in the former statute had given rise to the contradictory decisions above referred to. Congress, at the time of the passage of the amended act, had before it the history of the former statute and the conflicting decisions of the courts made as to the proper construction of the word "writing" as employed in that act, whether or not this term embraced private letters. A careful reading of the decisions on the original statute convinces the court that the conflict in these decisions grew out of the omission in that statute of the word "letter," and that if this term had been found in the original statute the decisions would have been uniform. It is obvious, the court thinks, that in the amended act of September 26, 1888, it was the purpose of congress to put this question at rest, which it did by the insertion of the word "letter." And this view is strengthened by a recent decision of the supreme court, in which, after adverting to the contrariety of opinions as to whether the word "writing" in tne statute before it was amended embraced the word "letter," and, deciding that question in the negative, the court add that "if further argument were needed in support of our view it will be found, we think, in the fact that in an amendment to this statute, passed September 26, 1888, (25 St. p. 496,) for the first time in the history of the postal service the word 'letter' was included in the list of articles made nonmailable by reason of their obscene, lewd, and lascivious, or otherwise improper character." *U. S.* v. *Chase*, 135 U. S. 255, 10 Sup. Ct. Rep. 756. The conclusion at which the court has arrived is sustained by the opinion of NELSON, J., in *Re Wahll*, 42 Fed. Rep. 822:

"In my opinion," said the learned judge in the case cited, "since the amendment of September 26, 1888, there can be no reasonable doubt that congress clearly expressed its intention to exclude obscene letters, whether private and sealed or unsealed. It in terms included an obscene letter, without any limitation, and struck out of section 3893 the former clause in reference to letters upon the envelopes of which obscene epithets, etc., were printed or written. It provided for guarding the sanctity and security of private correspondence by a provision that no sealed letter should be opened by any person except the one to whom addressed, but in no doubtful language declares an obscene letter nonmailable. * * * I think no one can follow the legislation from 1872 up to September 26, 1888, without being convinced that congress intended finally to purge the United States mail, and as far as possible prevent it from becoming a vehicle for the transmission of obscene, indecent, and lascivious messages."

A sufficient answer to the position taken by counsel for the defendant in regard to the inviolability of private correspondence, no matter what its character may be, if conducted by sealed letters, is found in the opinion of the supreme court of the United States in *Re Jackson*, 96 U. S. 727, wherein Justice FIELD, speaking for the court, said:

"The power vested in congress to establish post offices and post roads has been practically construed, since the foundation of the government, to authorize not merely the designation of the routes over which the mail shall be carried, and the offices where letters and other documents shall be received to be distributed or forwarded, but the carriage of the mail and all measures necessary to secure its safe and speedy transit and the prompt delivery of its contents. The validity of legislation prescribing what should be carried * * * has never been questioned. The power possessed by congress embraces the regulation of the entire postal system of the country. The right to designate what shall be carried necessarily involves the right to determine what shall be excluded. * * * In excluding various articles from the mail, the object of congress has not been to interfere with the freedom of the press, or with any other rights of the people, but to refuse its facilities for the distribution of matter deemed injurious to the public morals. Also, in the very recent decision of the same court, not yet officially reported, in what are known as the 'lottery cases.'" *Ex parte Rapier*, 12 Sup. Ct. Rep. 374; *Horner* v. *U. S.*, Id. 407.

The second ground of demurrer is that the letters on which this indictment was found are not obscene, lewd, or lascivious, or of an indecent character, within the meaning of the statute. The letters in question are as follows:

(No. 1.)

"October 12 1891 Mrs. Worley Dear Madame I write to know if you will take a trip to Lynchburg with me thursday. I will pay your expenses and pay you $5.00 besides. We will leave on day train and return next morning. I am not a stranger to you. but we must keep this a profound Secret. If you will go let me know by Wednesday and I will take the train on this side and you get on in North Danville. Just drop your letter in a box on this side and direct to O. Danville Va. tuesday evening. If you will go I will promise you a nice time Yours fondly."

(No. 2.)

"My Dear Mrs. Worley Your note received You are entirely mistaken in the man. Whilst I have seen you often I have never spoken a half doz. words to you. I have always admired you and have had a great desire to be with

you. and 1 write again and beg that you take the trip with me to Lynchburg. Say we will start Friday and come back Saturday. I know you will be greatly surprised when you find out who I am but I trust you will be agreeably so. Please write in the morning before ten o'clock and answer me in the affirmative. Now please do this for me and you will contribute so much to my happiness. I know you will never regret it. 1 am Yours devotedly O."

The court will define very briefly the meaning of the words "obscene, lewd, and lascivious, and of an indecent character," as employed in this statute. A very clear definition of "obscene" is "that which is offensive to chastity and modesty." *U. S.* v. *Harmon,* 45 Fed. Rep. 414. In *U. S.* v. *Clarke,* 38 Fed. Rep. 732, THAYER, J., says:

"The word 'obscene' ordinarily means something which is offensive to chastity, something that is foul and filthy, and for that reason is offensive to a pure-minded person."

These definitions were given to the word in question as applied to books, pamphlets, pictures, writings, and other publications which were named in the statute before it was amended; and since the insertion of the word "letter" in the amended statute the same definitions should unquestionably be given to the same word as applied to private letters also. Taking these definitions and applying them to the letters on which this indictment was found, the court cannot see how any other construction can be put upon them than that they are obscene within the meaning of the statute. The expressions used in the letters can leave no doubt as to their lewd and lascivious character. It is difficult to conceive what can be more shocking to the modesty of a chaste and pure-minded woman than the proposition contained in these letters. It is no less than a proposition from a married man to an unmarried woman, proposing a clandestine trip to the city of Lynchburg for a grossly immoral purpose. The motion to quash the indictment and the demurrer are overruled.