JOSEPH A. PROUT *et al. vs.* THE HOY OIL COMPANY *et al.*
Appellees.—(P. C. ANDREWS *et al.* Appellants.)

*Opinion filed April 23, 1914.*

1. LEASES—*owner of a dower interest in land has no power to make oil and gas lease.* The owner of a dower interest in land has no power to make a lease under which oil, gas or minerals can be removed from the land, unless she has been authorized in writing by the owner of the fee to make the lease as his agent.

2. SAME—*an oil and gas lease is not void because executed on Sunday.* In Illinois the fact that an oil and gas lease, or other contract, is executed on Sunday does not render the lease or contract void.

3. SAME—*what is not a false representation.* A representation by a party desiring to obtain the execution of an oil and gas lease by the owner of a dower interest in land, to the effect that a former lease made by her was invalid, is not a representation of fact but merely an opinion as to the legal effect of the lease, and such opinion furnishes no basis for a charge of fraud in obtaining the execution of the second lease by her, particularly where the first lease was, in fact, invalid.

4. SAME—*rule where parties are dealing at arm's length.* Parties desiring to obtain an oil and gas lease from the owner of the fee, where no fiduciary relation exists, are not obliged to volunteer any information as to the surrounding conditions, although if they do volunteer information for the purpose of influencing his action they must tell the truth and the whole truth.

5. SAME—*essential elements of a false representation.* A false representation such as will warrant a court of equity in setting aside a contract must be a statement of a material fact which the party making it knows is untrue and which is made for the purpose of inducing action by the other party, who believes the statement and acts in reliance thereon.

APPEAL from the Circuit Court of Wabash county; the Hon. WILLIAM H. GREEN, Judge, presiding.

S. J. GEE, and JOHN McGAUGHEY, for appellants.

KOLB & WHITE, and JONES & LOWE, for appellees.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Joseph A. Prout and his mother, Mary Prout, and Robert Rapp, Charles D. Carter and P. C. Andrews, filed their bill in equity in the Wabash circuit court to cancel an oil and gas lease and for other relief against the Hoy Oil Company and others who were supposed to have some interest in said lease. Several of the defendants filed a disclaimer and were dismissed out of the case. The Hoy Oil Company and B. F. Wireback were the only defendants who appeared to have any interest in said lease. Answers were filed denying the material allegations of the bill, and a hearing was had upon evidence taken in open court, resulting in a decree dismissing the bill for want of equity. A freehold being involved, complainants Carter and Andrews have prosecuted an appeal direct to this court.

This contest is between claimants under two alleged leases, both of which purport to lease the oil and other minerals in the same land. The ultimate question is as to which of the two leases is valid.

The circumstances preceding and connected with the execution of the two leases are as follows: Prospecting for oil and gas in the vicinity of Allendale, Illinois, and the taking of leases for that purpose, had been going on during the first half of the year 1912. A prospect well had been sunk on lands owned by a man by the name of Biehl. On July 30, 1912, oil was struck on the Biehl land in such quantity that the well filled up and ran over the casing, which projected eight or ten feet above the floor of the derrick used in drilling the well. This was the first well in Wabash county that produced oil in paying quantities. The Biehl well was about one-half mile east of north of the Prout lands which are involved in this controversy. After the Biehl well came in the prices of leaseholds advanced rapidly and competition in procuring them became sharp. The fee in the 52 acres embraced in the two leases in con-

troversy was in Joseph Prout. His mother, Mary Prout, had an unassigned dower in the premises. She was a widow, about seventy-two years of age, and resided in Allendale, two and one-half miles distant from the 52-acre tract above referred to. Her son, Joseph, who owned the fee, was a married man and resided with his wife in Chicago. After the Biehl well came in a number of persons attempted to procure an oil lease on the Prout land. About nine o'clock in the morning of July 31, 1912, being the next day after the Biehl well came in, Carter and Rapp called on Mary Prout and obtained from her a lease of the tract, in which she had a dower interest. This lease was made in consideration of one dollar and a covenant to pay one dollar per day until a well was put down on the premises, unless such well should be completed within six months from the date of the lease. At the time the lease was signed by Mary Prout, Carter and Rapp advanced her $31, which was a month's rental but was not due under the terms of the lease unless the lessees failed to drill a well within six months from the date of the lease. Carter and Rapp knew the condition of the title and that it would be necessary to have the lease executed by Joseph Prout in order to make it valid. Some time before the execution of this lease by Mary Prout she had written to Joseph advising him that there was a probability that she would have an opportunity to make an oil lease on the land and asking his advice in regard to the matter. He answered this letter, and the answer had been received by Mary Prout before Carter and Rapp called on her to secure the lease. Neither Joseph's letter nor a copy thereof was produced on the trial. The witnesses who claim to have seen the letter vary somewhat in their recollection of its contents. Joseph Prout testified the contents of the letter were as follows: "This will be your authority to go ahead and lease; go ahead and use your own judgment in leasing the land, if you think you have a good proposition; I will leave it to

you." Mary Prout testified that the contents of the letter were: "Just lease if you think it is best; do as you please about it." Rapp testified that he saw the letter on the day that he and Carter obtained their lease, and that the letter said, "Go ahead and lease the land;" that what she did would be all right with Prout; that what he wanted was a copy of the lease. Carter said that the letter contained this language: "You may lease the land but I want a copy of the lease." The above is all the evidence found in the record bearing upon the contents of this letter. It is necessary to have the evidence in regard to the contents of this letter stated in detail, for the reason that one of the questions to be determined is whether it authorized the mother to enter into a lease that would be binding upon the interest of Joseph Prout. A copy of the Carter-Rapp lease was left with Mary Prout.

About two o'clock in the afternoon of July 31, being about five hours after Mary Prout had signed the Carter-Rapp lease, George A. King, W. T. Leach and Charles Tanquary arrived at the home of Mary Prout in an automobile. King, who was acquainted with Mary Prout, went in to see her, and learned from her that Carter and Rapp had been there in the forenoon and that she had signed a lease to them, and she exhibited the copy of the lease to King. Leach and Tanquary were then called into the house, and after examining the Carter-Rapp lease, and knowing that Mary Prout only had dower in the land, advised her that the lease she had signed to Carter and Rapp was not valid. After Carter and Rapp had left the Prout home, and before the arrival of King, Leach and Tanquary, Mary Prout had had an interview with her son-in-law, Mr. Leighty, the result of which was that she directed Leighty to telegraph her son, Joseph, that she had signed a lease but that she advised her son not to sign it. The telegram, which was sent at 12:10 P. M. following the execution of the Carter-Rapp lease at 9:00 A. M., omitting the address and signa-

ture, is as follows: "Your mother leased that fifty acres this morning but is sorry of it, so do not sign it and you will get big money for it; we have a big oil boom on." After convincing Mary Prout that the Carter-Rapp lease was not valid, another lease was drawn leasing the premises to Leach. This lease contained substantially the same provisions that were in the Carter-Rapp lease, and in addition it provided for a cash payment to Mary Prout, in the nature of a bonus of $525. She, probably relying on the influence her telegram would have upon her son, assured these parties that her son would sign the last lease and that he would not sign the first. To protect the lessee against the possibility that Prout would not sign the second lease, the words, "To be cashed when J. A. Prout and wife sign the lease," were by the consent of all parties written across the face of the check for the $525 bonus, which was delivered in that form to Mary Prout.

After the execution of the second lease Leach and his associates drove to Mt. Carmel, a distance of ten miles, and made an effort to reach Prout by long distance telephone but were unable to do so. It was then arranged that King and Leach should go to Chicago that night to procure the signature of Prout. The party left Mt. Carmel in an automobile in the evening of the 31st and again went to Mary Prout's residence in Allendale, arriving there about nine o'clock in the evening. A letter had been prepared, addressed to Joseph Prout, advising him to sign the Leach lease, and it was for the purpose of obtaining Mary Prout's signature to this letter that the second trip to Allendale was made in the evening. She had retired when the party arrived but got up and signed the letter. The party then drove in an automobile from Allendale to Vincennes, Indiana, where Leach and King caught a night train for Chicago. The letter which Mary Prout had signed contained a statement that she had signed the Carter-Rapp lease and advised her son not to sign that lease but requested him to

sign the Leach lease. On that same night Carter went to Chicago over the Big Four railroad and arrived in Chicago on the morning of August 1, at about the same hour that King and Leach arrived over another line of road. So far as the evidence shows neither party knew of the movements of the other. Leach and King knew that the Carter-Rapp lease had been signed by the widow, but it does not appear that Carter knew of the execution of the Leach lease when he arrived in Chicago. Leach and King began at once a search for Joseph Prout. They had his address, which they had obtained from his mother. They located him on the west side of the city, where he was engaged as a foreman over a gang of men employed in doing construction work for the Chicago Telephone Company. King and Leach found him about nine o'clock in the forenoon. King knew Prout, and he introduced Leach as a man engaged in the oil business, and stated that he had a lease on the farm signed by Prout's mother, and also stated that a check had been left with his mother for $525, which was to be paid to her when Prout and his wife signed the lease. After some conversation Prout signed the Leach lease and acknowledged the same before a notary public. He wrote a note to his wife and delivered it to Leach and King, requesting her to sign the lease. Leach and King started away to obtain the signature of Mrs. Prout. After King and Leach left him to get Mrs. Prout's signature to the lease Prout called his wife on the telephone and told her not to sign the lease which would be presented to her by Leach and King, and Mrs. Prout informed her husband that a telegram had been delivered for him from his brother-in-law, Leighty, and informed him as to its contents. Prout told his wife to bring the telegram to him where he was at work, which she did. King and Leach finally found Mrs. Prout and urged her to sign the lease, but she refused to do so. They made an engagement with Mr. and Mrs. Prout at the Great Northern Hotel for 9:00 o'clock P. M.,

but the Prouts did not keep the engagement. Later in the evening King again visited the Prout residence and made another unsuccessful effort to get Mrs. Prout to sign the lease.

In the afternoon of August 1 Carter succeeded in finding Prout and sought to obtain the signatures of Prout and his wife to his lease. Carter told Prout that the Biehl well had come in and that it gave promise of being a very profitable well. Prout decided to go down to Allendale and investigate the conditions in person. He did so, and arrived in Allendale on the morning of August 3. He spent most of the day in gathering information in regard to the value of his premises, and late in the afternoon of that day he made an agreement with Carter, acting for himself and Rapp, that he would execute the Carter-Rapp lease and have his wife sign the same for a bonus of $5000. This agreement was entered into between five and six o'clock in the afternoon of Saturday, the third of August. Carter had arrived home from Chicago on the morning of August 2 and was met at the train by his partner, Rapp, who took the lease and went to Mt. Carmel and caused the same to be filed on that day by the recorder of Wabash county, and the lease was left in the possession of the recorder and was in his possession on the third and fourth days of August. On Sunday, August 4, Prout, Carter and Rapp went to Mt. Carmel to secure the lease from the recorder for the purpose of having it executed by Prout. The recorder refused to permit them to take the lease out on that day, and thereupon another lease was executed, which recited that it was made for the purpose of ratifying and confirming the Carter and Rapp lease. This lease was executed by Prout and his wife and a check for $4000 was delivered to Prout, and it was agreed that the check should not be presented for payment until an abstract of title was furnished showing Prout to be the owner of the land. An abstract was afterwards submitted to attorneys for the lessees and ap-

proved, and the $4000 check was then cashed. By mutual agreement $1000 of the bonus was left in the hands of Carter and Rapp to protect them against any expense which they might incur in litigation growing out of the leasing of said lands. Within a few days after the execution of this lease Carter and Rapp sold and assigned a three-fourths interest in said lease to P. C. Andrews for a consideration of $4000. Andrews now owns a three-fourths interest and Carter and Rapp each a one-eighth interest under this lease. While Prout was in Allendale on the third of August he met Leach, and Leach offered him $1000 if he would have his wife sign the Leach lease, but Prout refused the offer. Leach then procured $525 in cash and went to the home of Mary Prout and tendered the same to her in payment of his check, and offered to waive the condition so far as the payment of the check was made dependent upon Mrs. Joseph Prout signing the lease. Mary Prout refused to accept the money, and Leach thereupon went away, saying, "I am going to operate this lease anyway." On Sunday evening after the ratifying lease to Carter and Rapp had been executed, Carter and Rapp attempted to take possession of the demised premises under the lease and moved some casing and rig-timbers thereon, and shortly afterwards commenced the construction of a derrick to be used in drilling a well on the Prout land. Leach and his associates also moved a well-drilling outfit onto the premises at night and commenced the drilling of a well, and continued operations until September following, when the well was completed. Andrews, Carter and Rapp notified the persons operating under the Leach lease not to do any work upon said premises, but no attention was paid to the notice and the well was completed and became a producing well in September.

The foregoing statement describes the situation in general outline when the Prouts, Carter, Rapp and Andrews filed the bill in this case for the cancellation of the Leach-King lease and for an injunction restraining the defendants

from prosecuting any further work on said premises under said lease.

It requires no discussion or citation of authority to show that Mary Prout, who held only a life interest in the premises, had no power to make a lease under which oil, gas or other minerals could be removed from the land. The lease, therefore, executed by Mary Prout to Carter and Rapp cannot be held to be binding, in so far as the remainder in fee is concerned, unless Joseph Prout had authorized his mother to make a lease as his agent, by an instrument in writing duly signed by him as the owner of the fee. The Statute of Frauds is relied upon, and furnishes a basis for declaring the first lease executed to Carter and Rapp invalid if appellees are in a position to avail themselves of the statute. The letter written by Joseph Prout to his mother did not purport to authorize her to act for the son, and, furthermore, the lease executed by her did not purport to have been made on behalf of anyone except Mary Prout. It was not understood by the lessees at the time the lease was executed by Mary Prout that it was binding upon anyone other than herself. This is shown by the hasty and persistent efforts that were made to procure the execution of the lease by Joseph Prout and his wife. The insistence that the execution of the lease by Mary Prout was binding upon the owner of the fee by reason of the authority contained in the lost letter of Joseph Prout to his mother appears to have been an afterthought, which arose after all of the events which go to make up the facts in this controversy had occurred. Whatever view may be taken with respect to the first lease executed to Carter and Rapp, there can be no serious question that the lease executed by all the parties on August 4 was a valid lease and conveyed all of the mineral rights that Joseph Prout and his mother had in the premises, unless the Leach lease was valid. It is true the point is made that the second Carter-Rapp lease was made on Sunday, and it is insisted that it

is void for that reason. Such is not the law of Illinois. (*Richmond* v. *Moore,* 107 Ill. 429.) If the lease executed on August 4 to Carter and Rapp is valid, appellants are entitled to the relief prayed for in their bill without regard to the validity of the first lease executed to Carter and Rapp by Mary Prout, provided the evidence is sufficient to justify a court of equity in setting aside the Leach lease because its execution was procured by misrepresentation and fraud. According to the view that we have of this controversy it all depends upon the validity of the Leach lease. If that lease is valid and binding upon Joseph Prout, it follows, necessarily, that appellants cannot maintain their bill.

Appellants allege that the execution of the Leach lease by Mary Prout and Joseph Prout was obtained through false and fraudulent representations. In so far as this charge relates to the execution of the lease by Mary Prout there is no evidence in the record that tends in the slightest degree to sustain it. All of the evidence shows that before the execution of the Leach lease by Mary Prout she had her son-in-law (Leighty) sent for and the subject of leasing to Leach was gone over fully, and she had the advice and counsel of her son-in-law before executing the lease. The only statement that was made to Mary Prout which is relied on as a basis for the charge of fraud is, that King expressed the opinion to her that the Carter-Rapp lease was not valid, and the reasons which he gave for the opinion were, that she only had a dower interest in the land and the lease did not contain a description of the land. Conceding that this statement was made, it has none of the elements of a false representation. While it was merely given as an opinion upon the legal effect of a lease of this character executed by a life tenant, it appears to have been a true statement. The Carter-Rapp lease was not valid and amounted to nothing so long as it was only executed by the life tenant. Both Mary Prout and Leighty knew as much about the Biehl well as King and Leach. There is

no ground for the charge that the execution of the Leach lease by Mary Prout was obtained by fraud.

The only remaining question is whether the evidence sustains the charge of fraud in respect to the execution of the Leach lease by Joseph Prout. There is a conflict between the evidence of Joseph Prout on the one hand and that given by Leach and King on the other as to what occurred in Chicago at the time Prout signed the lease. Prout testifies that these men came to him where he was engaged at work and told him that they had a lease which they wanted him to sign; that his mother had signed it and they had left a check with her for $525, which would be cashed when he and his wife signed the lease; that they told him that the Biehl well was being drilled, and that if it came in good it would make him rich or make him a great deal of money. He also testifies that at the time he signed the Leach lease he did not know that the Biehl well had come in, and, further, that he did not know that his mother had signed the Carter-Rapp lease; that he had not received the telegram sent by Leighty at that time and that Leach and King did not show him the letter from his mother until after he had signed the lease, and he states that after he had executed the lease King and Leach started away, and had been gone some minutes when they returned to him and then for the first time gave him the letter which his mother had sent to him by them. Leach and King testify that Leach gave Mary Prout's letter to Joseph at the same time he handed him the lease and that Prout read the letter and then went over the lease. They testify that King told him that the Biehl well was in and was a very fair well; that it had been reported over the telephone as producing from twenty-five to one hundred barrels per day, and that some reports were as high as four hundred or five hundred barrels, and that the oil was running over the casing and out over the ground. If the version of what occurred, given by King and Leach, be accepted as true,

then there was neither fraud nor false representation. In fact, according to their testimony they gave Prout information which they were not required by the rules of law to give him. The parties were upon an equal footing and dealing at arm's length. There was no fiduciary relation of any character existing between them. Under these circumstances Leach and King were not bound to give Prout any information which they had. They had a right to remain silent without violating any rule of law or equity, yet if they volunteered to give information for the purpose of influencing the conduct of Prout it became their duty to tell him the truth and the whole truth. A misrepresentation which will warrant a court of equity in setting aside a contract must contain the following elements: First, it must be a statement of fact; second, it must be made for the purpose of inducing the other party to act; third, it must be untrue; fourth, the party making the statement must know or believe it to be untrue; fifth, the person to whom it is made must believe in and rely upon the statement; and lastly, the statement must be material. (*Prentice* v. *Crane*, 234 Ill. 302; *Gillespie* v. *Fulton Oil and Gas Co.* 236 id. 188.) The preponderance of the evidence does not establish any misrepresentation by Leach and King, or either of them, to Prout which under the authorities would warrant a court of equity in declaring the Leach lease void. This lease, when executed on the first day of August, conveyed all the right, title and interest which Prout had in and to the oil, gas and other minerals in the land described, from which it follows that his subsequent lease to Carter and Rapp is invalid.

Under the evidence in this record the court properly dismissed the appellants' bill, and its decree will therefore be affirmed.                    *Decree affirmed.*