**CARTER OIL CO. v. McQUIGG et al.**
(two cases).
Nos. 7071, 7073, 7150.

Circuit Court of Appeals, Seventh Circuit.
March 20, 1940.

Rehearing Denied June 21, 1940.

William M. Acton, of Danville, Ill., and Walter Davison, Craig Van Meter, and Fred H. Kelly, all of Mattoon, Ill. (L. G. Owen, of Tulsa, Okl., of counsel), for Carter Oil Co.

John J. Baker and J. C. Willard, both of Shelbyville, Ill., and Clayton J. Barber, of Springfield, Ill. for McQuigg et al.

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

**EVANS, Circuit Judge.**

This litigation is traceable to the discovery of oil in an area which included an eighty acre tract of land in Fayette County, Illinois, the title to which in 1919 was in Leander J. Wood and his wife, Emily. The discovery of oil in this vicinity gave to the land a value undreamed of and was provocative of an assiduous, aggressive litigation.

The basis of the controversy is the reservation in a quitclaim deed from the fee owners, Leander J. Wood and wife, Emily, to their five children, Lemuel, Charles, John Arthur, Dorothy W. Miller, and Alice W. Gregg (who subsequently died leaving a husband, George, and three children, Kermit, Emily (minor), and Kenneth). This quitclaim deed bore date of January 30, 1919. It contained the following litigation-breeding provision: *"Provided, this deed is not to take effect during the lifetime of either of the grantors."*

In view of this provision, the question was and is—Who can grant a valid oil mining lease to this land?

The oil companies and oil land speculators have come to grips over it. What was the estate which the father and mother reserved—a life estate? Nothing more? If so, were the life tenants or the remaindermen entitled to the oil? The lure of rich royalties was too strong for the family ties. The speculator, in search of options and leases, was callous to the bonds of family sentiment. The execution of a lease by the parents to a competitor was no deterrent to him. The children yielded to the promise of riches. The litigation was on. The issues of fact are as numerous as the questions of law. Contradictions and disputes in testimony are sharp and in some instances, hard to reconcile with the witnesses' honesty of belief.

The plaintiff, The Carter Oil Company, derived its asserted rights through an oil lease from Leander J. Wood and wife, who may be called the life tenants. This lease bore date of June 9, 1936.

Plaintiff also claims rights in and to two-fifths of the remainder estate (a) through a lease from the son, Arthur, bearing date March 31, 1937, and (b) through a deed from the grantee of one of the children, a son Lemuel Wood.

The validity of the lease from Arthur is assailed because of alleged material alterations in it and additions to it. The conveyance from Lemuel is attacked on the ground that the grantee of Lemuel was merely a mortgagee without power to convey.

As to (b) plaintiff contends it is an innocent purchaser who acted in the good faith belief that its lessor had acquired Lemuel's interest by a valid absolute deed of conveyance.

Although the various lessees and remaindermen are made defendants in the suit, the real adversary party is one termed an oil land prospector, Harry M. McQuigg, who sought and secured leases from some of the children and a quitclaim deed from the life tenants. His deed from the life tenants was executed, however, after they had executed their leases to the plaintiff. He also obtained oil leases from some of the remaindermen,—to-wit, a lease from Arthur subsequent to the one executed to the plaintiff. His lease from Lemuel Wood, to whom Hogge had reconveyed the remainder interest theretofore conveyed to him in the "mortgage" transaction, was subsequent to the execution of a lease by Hogge to the plaintiff. McQuigg obtained a lease from Dorothy Miller, one of the children, January 31, 1938; from Arthur, January 12, 1938 (after the execution by Arthur of a lease to plaintiff, March 31, 1937); and from the three children of the deceased daughter Alice.

Describing the situation generally,— plaintiff had a lease from the life tenants and claimed to have valid leases from owners of two-fifths of the remainder estate. Its rights under the two leases were disputed.

Defendant McQuigg claimed (a) through leases from holders of three of the remaindermen,—a three-fifths interest in said remainder estate. (b) Also he claimed an interest in the remaining two-fifths of the remainder estate through leases obtained subsequent to the leases which had been executed to plaintiff. (c) Also he claimed through a quitclaim deed from the

life tenants which however was subsequent to their lease to plaintiff.

(6) What effect should be given to an attempted voluntary partition of the land

## PLAT SHOWING DISPOSITION OF 80 ACRES HELD IN FEE BY LEANDER AND EMILY WOOD

The questions and issues which we must determine are:

(1) The extent and character of the estate of Leander J. Wood and Emily Wood—the so-called life tenants.

(2) The fact dispute over the subsequent alleged additions of words to the Arthur Wood lease.

(3) The weight to be given to the District Court's and the special master's findings of fact when in conflict.

(4) The existence and effect of the asserted innocent purchaser status of plaintiff in acquiring the lease from Hogge, the grantee of the son, Lemuel.

(5) Where the life tenant and remaindermen refuse or are unable to agree, what are the rights of oil lessees who are claiming under adversary lessors when oil from the pool which underlies the land in question and also adjoining tract is being removed by wells drilled on adjacent land?

in view of the fact that one of the heirs of the daughter Alice is a minor?

(7) The power and also the duty of a court of equity, having jurisdiction of the parties who together own the fee, to appoint a receiver upon a showing that oil was being rapidly withdrawn through wells drilled on adjacent land.

(8) The effect of the statute passed by the 1939 Illinois legislature (Session Laws 1939, p. 805, Ill. Bar Stats. 1939, Chap. 104, par. 25-33) on this litigation.

(9) The disposition of the conflict between the jurisdiction of the Federal Court which had pending a suit between the same parties and the jurisdiction of the state court which took jurisdiction of a suit between the same parties, after the passage of the Illinois 1939 Oil Act.

The first and perhaps the most vital legal question for determination is the character and nature of the estate which

father and mother Wood reserved when they quitclaimed to their five children. Plaintiff asserts it was more than a life estate. Defendants contend that the law of Illinois governs, and similar reservations have been construed adversely to plaintiff's views in Shackelton v. Sebree, 86 Ill. 616; Bullard v. Suedmeier, 291 Ill. 400, 126 N.E. 117; Harshbarger v. Carroll, 163 Ill. 636, 45 N.E. 565; Latimer v. Latimer, 174 Ill. 418, 51 N.E. 548; Bowler v. Bowler, 176 Ill. 541, 52 N.E. 437; Venters v. Wickens, 224 Ill. 569, 79 N.E. 946; White v. Willard, 232 Ill. 464, 83 N.E. 954.

The District Court said:

"If this question were undecided in Illinois, I would be inclined to follow the decisions in various jurisdictions, cited in Tiffany on Real Property, Vol. 2, p. 1814, and 68 Corpus Juris, 612, 614. In many jurisdictions, perhaps the majority, it is held that such language cannot be said to apply simply to the enjoyment or possession of the property, but that it applies equally to the entire force and effect of the instrument and is repugnant to and inconsistent with the creation of any present legal estate. However, I am bound by the laws of Illinois, and there, beyond question, a contrary rule controls."

Plaintiff's urge that the estate, while limited to the lives of the grantors, was something more than the usual legal life estate, it being a grant from parents to children, is a persuasive one. There is undoubtedly merit in the argument that in a deed from parents to children the reservation that it "is not to take effect during the life time of the grantors" might well be construed so as to permit the parents to do with the land during their lives, the same as though no deed had ever been made.

We confess this argument might be controlling, but for the aforecited Illinois court decisions dealing with reservations couched in language so similar as to be nondistinguishable and which hold to the contrary. We are required to accept these Illinois Supreme Court decisions.

■ The second, third, and fourth questions may be considered together. They turn on the weight which the appellate court should give to findings made by a District Court in conflict with the findings of a special master who saw and heard the witnesses. For the plaintiff it is argued that under Rule 53(e) (2) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, an appellate court is required to give more weight to the master's finding than under Equity Rule 61½, 28 U.S.C.A. following section 723. Commentators on Federal Practice give support to this view. * We do not agree. The New Rules of Civil Procedure were not intended to change the law in this respect. In weighing the conflicting findings by the master and the District Court, the practice, we think, is the same under F.R.C.P. Rule 53 (e) and Equity Rule 61½. This court has had occasion to discuss this question more than once. Uihlein v. General Electric Co., 7 Cir., 47 F.2d 997.

■ Where the question is one of veracity it is clear that the appellate court should give controlling weight to the trier of fact who saw and heard the witnesses. This is well established. Where the testimony consists of documentary evidence and depositions, the master is in no better position to determine an issue of fact than a reviewing court. The District Court's finding on such evidence is likewise subject to free review unaffected by presumptions which ordinarily accompany their findings on controverted issues.

Difficulties threaten when much of the testimony is uncontradicted, but conflicting inferences are properly deducible therefrom.

The problem becomes more serious when most of the testimony is of the class last described, but it is supplemented in part by some oral testimony, the weight of which depends on the credibility of the witnesses, but which is contradicted by plausible, reasonable testimony of disinterested witnesses.

Still another situation arises when a certain evidentiary fact somewhat essential to a finding by the master is supported by testimony of a prejudiced, interested witness or party, which is so overwhelmingly refuted as to well-nigh impel rejection by the reviewing court. And a like situation exists when the support for a trier's finding is sustained by testimony which is so improbable as to approach but not quite reach the unbelievable.

Some of the elements of all of the foregoing situations are present in this case. They caused the District Judge to differ with the master who, it should be said,

---

*Moore, "Federal Practice Under the New Rules," page 3144.

thoroughly, fully and frankly covered the subject in his discussion and findings. The District Court was as fully appreciative of the rule as it was of the thoroughness of the master's report. We will not state our reasons for our conclusion, for the District Court has well set them forth in the opinion in 27 F.Supp. 182.

We are not satisfied that the court erred in modifying the master's report. Our study of the record leads us to the conclusion reached by the District Court. Unless we assume several of plaintiff's witnesses deliberately falsified, the master's finding is incorrect. On the other side of this issue there is a possible reconciliation of the testimony of some of defendants' witnesses with mistake rather than deliberate or wilful perjury. We accept the District Court's findings as a verity in this case. This applies to the alleged alterations in the Arthur Wood lease and the facts which determined plaintiff's status of an innocent purchaser when it acquired its lease from Hogge.

Defendants' challenge of the plaintiff's innocent purchaser status is directed to the word "purchaser." A lessee is not a purchaser, so they assert, if the consideration be only the rental. As the court points out, the payment of future royalties was not the only consideration for the lease in question. The cash down-payment was sufficient to give the plaintiff an innocent purchaser standing. Poe v. Ulrey, 233 Ill. 56, 84 N.E. 46; Greer v. Carter Oil, 373 Ill. 168, 25 N.E.2d 805, decided February 21, 1940.

Having acquired its lease as an innocent purchaser in good faith and for a valuable consideration, defendants' subsequently executed lease of the Lemuel Wood-Hogge interest must be held to be subservient and secondary to plaintiff's lease. Jenkins v. Rosenberg, 105 Ill. 157, 164; Robbins v. Moore, 129 Ill. 30, 21 N.E. 934. This makes unnecessary a decision as to whether the deed from Lemuel Wood to Hogge was in fact a mortgage.

The law of Illinois is equally settled as to the rights of the life tenant and remaindermen in and to oil found on the land. Prout v. Hoy Oil Company, 263 Ill. 54, 105 N.E. 26; Sewell v. Sewell, 363 Ill. 166, 1 N.E.2d 492. See also volume 2, Summers on Oil and Gas, § 224, page 24. The life tenant may not take the oil from the land. The remainderman may not go on the land to drill for oil or remove the oil, without the consent of the life tenant. Also, it is clear the remaindermen may not go on the property to drill for oil during the life of the life tenant against the latter's will. While the life tenant may have no interest in the oil and no right to take it from the land, he can prevent the remainderman from going on the premises during the existence of his life estate. Orthwein v. Thomas, 127 Ill. 554, 21 N.E. 430, 4 L.R.A. 434, 11 Am.St.Rep. 159; Wright v. Stice, 173 Ill. 571, 577, 51 N.E. 71.

Voluntary Partition. The act of the parties in attempting to voluntarily partition this land clearly reveals the character of this litigation. They here attempt to defeat the leases previously made through a voluntary partition which would give the lessor the less valuable tracts (so far as oil value is concerned) and possibly defeat the leases otherwise valid and by them deliberately made. No possible explanation of their action can be made other than they were seeking to avoid their leases and to find one who might in turn repay them for their lack of integrity. Such motive and conduct is what we referred to when weighing evidence on the contested factual issues. The means adopted by them were too ingenious to have originated solely in their brains. Yet, though the procedure adopted was indicative of legal advice, the fraudulent scheme is transparently clear.

In and by this voluntary partition two lessors who have given two leases are endeavoring to relieve themselves of the burden of accepting and looking after oil royalty payments and to lessen the value of their interest in the eighty acres to almost nothing. Analysis of their motive for this action leads to but one of two conclusions: Either they have had a change of attitude towards oil lease royalties and their augmented incomes therefrom, or they are in a plot or conspiracy to defeat the leases they executed in the belief that they will be cared for by McQuigg better than under the leases to the plaintiff, after the object of their conspiracy has been accomplished.

The voluntary partition defense in this case must fail for any one of three reasons:

First. To be valid, a voluntary partition must not be fraudulent,—either fraudulently conceived or fraudulently effectuated. Good faith must attend the action of the partitioners. It is void if its purpose is to

defraud innocent third parties who have mortgages or leases on undivided interests, the defeat of which is the principal or sole object of the partition.

Second. A voluntary partition, to be valid, where there are innocent purchaser interests such as mortgages or oil leases outstanding against one or more of the estates of the co-tenants, must give such third parties a hearing and in the deliberations and final action, the third party innocent purchaser interests should be accorded the status of parties.

Third. Where one or more of the co-tenants is a minor or an insane person, a voluntary partition is impossible because the interest of the incompetent must be protected by a qualified guardian *ad litem*. The duty of the guardian *ad litem* is not limited to protecting the incompetent against loss through bad judgment, but also against a partition instituted by co-tenants to defraud others. Such protection is necessary so as to avoid subsequent litigation against the incompetent, which is likely to be as injurious as the selection of the less valuable tract of land.

In Cochran v. Cochran, 277 Ill. 244, 115 N.E. 142, 145, the Supreme Court of Illinois said, "It is well settled that a voluntary partition which is not binding on all the co-tenants is not binding on any of them."

No. 7150. This appeal is from the order made in this same suit but after the entry of the order which established and fixed the rights of plaintiff and defendants in the land in question. This decree provided for the retention of jurisdiction, and defendants were the first to invoke this reserved jurisdiction. They asked for the appointment of a receiver to protect their interests against the draining of the land by wells on adjoining tracts. The plaintiff in its original suit had, in its prayer for relief, asked for the appointment of a receiver and the protection of this land's oil deposit from the withdrawal of oil through wells on other tracts.

After the Illinois Legislature passed its 1939 Oil Act, however, defendants, without waiting for disposition of their motion to appoint a receiver in the court below, instituted suit in the state court. Plaintiff herein appeared specially and called the state court's attention to the existing pending litigation over this same tract, but the state court refused to recognize the Federal Court's jurisdiction. Thereupon plaintiff moved this District Court to enjoin the defendants from proceeding in the state court and to appoint a receiver to protect plaintiff's (and also defendants') interest in the property. This is the order before us on this appeal, No. 7150.

In view of the fact that both plaintiff and the defendants asked the District Court for the appointment of a receiver, we may well assume that it had jurisdiction, in a proper equity suit with all the parties before it, to protect the interests of all in the land in question through the appointment of a receiver. We entertain no doubt as to its power. The only question which has arisen is the effect of the state court proceedings instituted by virtue of the Illinois 1939 legislation.

Two answers to defendants' contention in favor of state court jurisdiction are made:

First, assuming concurrent jurisdiction in both the state and the Federal Courts, it is clear, under Harkin v. Brundage, 276 U.S. 36, 43, 48 S.Ct. 268, 271, 72 L.Ed. 457, that:

" * * * As between two courts of concurrent and co-ordinate jurisdiction, the court which first obtains jurisdiction and constructive possession of property by filing the bill is entitled to retain it without interference and can not be deprived of its right to do so, because it may not have obtained prior physical possession by its receiver of the property in dispute."

See also Penn General Casualty Company v. Commonwealth of Pennsylvania, 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850.

Likewise, it is apparent that the state statute relied upon can not be applied to facts in the instant case. Section 7 of the Act referred to provides among other things that:

"If the court shall find * * * that said plaintiffs are entitled to, or have been granted by any life tenant, the present right of possession or right to use the surface of such lands, the court shall enter a decree authorizing the plaintiffs to drill * * *."

The defendants here (plaintiffs in the state court) could not establish this necessary fact.

The decree in all three appeals must be affirmed. The plaintiff must pay the costs in this court in No. 7071, and the defendants shall pay the costs in No. 7073 and No. 7150.