Joe BONICA, doing business as Movie-of-the-Month Club, Movie-of-the-Month and Movie Newsreels, and John Bonica, doing business as 8 MM Movie Club and Movie Club, Plaintiffs,

v.

Otto K. OLESEN, individually and as Postmaster of the United States Post Office at Los Angeles, California, Defendant.

No. 16449.

United States District Court
S. D. California, Central Division.
Nov. 22, 1954.

Laughlin E. Waters, U. S. Atty., for the Southern Dist. of Cal., Los Angeles, Cal., by Max F. Deutz and Richard A. Lavine, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

Gerald L. Kales, Hollywood, Cal., for plaintiffs.

TOLIN, District Judge.

This is an action to enjoin the United States Postmaster at Los Angeles from refusing to deliver mail to the plaintiffs.[1]

Since 1946, plaintiffs have engaged in the business of selling motion picture films by mail. The films consist of educational and scenic pictures, children's comedies, and a small class called pin-up pictures. They are sold primarily for home use. The uncontraverted affidavit of one of the plaintiffs indicates that more than ninety per cent of plaintiffs' expenditures have been in the production of musical, scenic, fishing, and similar types of films; and that their business has grossed almost one and one-quarter million dollars. All but eleven of their pictures have not been challenged in either the administrative hearing or the trial of this cause. Prospective buyers were solicited by advertisements in national magazines and by mailed circulars, and the orders were generally filled by mail.

In 1953, a complaint was issued by the Post Office Department charging that there was probable cause to believe that the plaintiffs were obtaining and attempting to obtain remittances of money through the mails for films of an obscene, lewd and lascivious character in violation of statute,[2] and that therefore plaintiffs should be denied the use of the mails. In particular the complaint charged that eleven of plaintiffs' films were of the prohibited character.[3] The plaintiffs responded denying that the specified films were obscene, lewd, or lascivious, *and requested further information as to what parts of the named films were deemed objectionable so that such parts might be deleted.* Despite this apparent willingness to accept the censorship sought to be imposed, no further information was furnished the plaintiffs. In December of 1953, an administrative hearing was held in Washington, D. C.[4] and the Examiner found that the eleven films were obscene, lewd and lascivious. Pursuant to this finding, the Postmaster General ordered that *all* postal money

---

1. Certain other incidental relief is also requested.

2. Title 39 United States Code Annotated, § 259a.

3. An affidavit of one of the plaintiffs indicates that they carried some 150 different film subjects.

4. While there does not appear to have been any request for a transfer of the hearing, attention is directed to the remarks of Mathes, J., in Jeffries v. Olesen, D.C.S.D.Cal., 121 F.Supp. 463, 475, regarding the obvious desirability of holding such hearings in or near the respondents' locality.

"There is much to be said for the view that 'Big' Government, with its unlimited resources, should be willing to contest with 'little' citizen on the latter's own ground."

orders and letters directed to the plaintiffs be returned to the senders with notification that payment and delivery was "unlawful" and had been forbidden by order of the Postmaster General. The order was prohibitive in terms and gave no opportunity for staying the full force of a total bar. There was no opportunity afforded the plaintiffs to cease the distribution of the questioned material as a condition of avoiding the drastic action of being totally barred from receipt of mail. The result was immediate and comprehended receipt of all mailed matter including such inocuous items as utilities or tax bills. Since the order applied to *all* money orders and mail addressed to the plaintiffs, whether relating to the few cited films or otherwise, the plaintiffs were, in effect, completely put out of business by the order.

On commencement of this action, a temporary restraining order and preliminary injunction issued against the defendant pending the outcome of this action in order to prevent the complete destruction of the plaintiffs' business before the matter was finally determined. The plaintiffs have represented by way of affidavits (which have not been rebutted) that since the original complaint was filed by the Post Office, all orders and money received for the specific films which the Postmaster has labeled obscene, lewd, and lascivious, have been returned.

Three separate issues are presented by this action: (1) the constitutionality of the section invoked; (2) the constitutionality of the specific *application* of this section; and (3) a review of the administrative action against the plaintiffs in other than its constitutional aspects. Pursuant to motion of the plaintiffs, a separate trial was ordered on the latter issue alone, with jurisdiction retained to dispose of the constitutional questions if necessary to an adequate adjudication of this case.

The scope of judicial review of administrative action such as that involved here, is set forth in the United States Code Annotated, Title 5, Section 1009(e), and includes the power to:

"* * * (B) hold unlawful and set aside agency action, finding, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * * (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; * * * (5) unsupported by substantial evidence * * *."

The Supreme Court has recently set forth the kind of scrutiny which a reviewing court must give the administrative record to satisfy itself that the agency action rests on adequate proof. In Universal Camera Corp. v. National Labor Relations Board,[5] the court said:

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting (an administrative) decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. Committee reports and the adoption in the Administrative Procedure Act of the minority views of the Attorney General's Committee demonstrate that to enjoin such a duty on the reviewing court was one of the important purposes of the movement which eventuated in that enactment.

"* * * Congress has merely made it clear that a reviewing court

---

**5.** 340 U.S. 474, 71 S.Ct. 456, 464, 95 L.Ed. 456.

is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view. * * *

"We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act [29 U.S.C.A. § 141 et seq.] direct that courts must now assume more responsibility for the reasonableness and fairness of (administrative) decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

It appears that the only controverted issue at the administrative level was whether or not the films were "obscene, lewd, or lascivious", and that the only evidence on this crucial question was the films themselves. Thus, the court is in a particularly advantageous position to evaluate the evidence.[6]

■■■ The words obscene, lewd, and lascivious have received extensive and varied judicial interpretations.[7] The

6. "Where the question is one of veracity it is clear that the appellate court should give controlling weight to the trier of fact who saw and heard the witnesses. This is well established. *Where the testimony consists of documentary evidence and depositions, the master is in no better position to determine an issue of fact than a reviewing court.* The District Court's finding on such evidence is likewise subject to free review unaffected by presumptions which ordinarily accompany their findings on controverted issues." (Emphasis supplied.) Carter Oil Co. v. McQuigg, 7 Cir., 112 F.2d 275, 279; Id., 27 F.Supp. 182. See also, Kycoga Land Co. v. Kentucky River Coal Corporation, 6 Cir., 110 F.2d 894.

7. These words have been held to apply to matter which is calculated to excite lustful and sensual desires in those whose minds were open to such influences, United States v. Clarke, 8 Cir., 38 F. 732; having a tendency to excite lustful thoughts, United States v. Slenker, 4 Cir., 32 F. 691; that form of indecency which is calculated to promote the general corruption of morals, United States v. Males, 7 Cir., 51 F. 41; that which is offensive to chastity and modesty, United States v. Martin, 4 Cir., 50 F. 918; matter offensive to the common sense of decency and modesty of the community, and of such a character as to deprave and corrupt those whose minds are open to such immoral influences, United States v. Harmon, 10 Cir., 45 F. 414, reversed on another ground, 50 F. 921; whatever is impure, unclean, indecedent, foul, filthy, or disgusting, United States v. Smith, 7 Cir., 45 F. 476; matter having a tendency to deprave or corrupt morals of those who would receive them, regardless of actual effects on mind of recipient, Verner v. United States, 9 Cir., 183 F. 2d 184; that present critical point in the compromise between candor and shame at which the community may have arrived here and now, United States v. Kennerley, 2 Cir., 209 F. 119; matter calculated to arouse, or implant in the minds of those into whose hands it might come, lewd or lascivious thoughts, or have a tendency to deprave or corrupt morals, Griffin v. United States, 1 Cir., 248 F. 6; matter which would tend to deprave or corrupt the morals of reasonable persons, and would suggest to the minds of either sex thoughts of an impure or libidinous character, United States v. Musgrave, 8 Cir., 160 F. 700; matter offensive to the sense of chastity and naturally calculated or tending to suggest to, or create in the mind of the re-

Ninth Circuit [8] has recently approved an instruction and definition of the phrase in a criminal action for placing such material in the mail:

> " 'Matter is obscene, lewd or lascivious, within the meaning of the quoted statute, if it is offensive to the common sense of decency and modesty of the community, and tends to suggest or arouse sexual desires or thoughts in the minds of those who by means thereof may be depraved or corrupted in that regard.' ' * * * words "obscene, lewd, or lascivious", * * * have the meaning of that which is offensive to chastity and modesty. They mean that form of indecency which is calculated to promote the general corruption of morals. The true test to determine whether a writing is non-mailable as obscene, lewd, or lascivious is whether its language has a tendency to deprave or corrupt the morals of those whose minds are open to such influences and into whose hands it may fall by allowing or implanting in such minds obscene, lewd, or lascivious thoughts or desires.' "

The court specifically emphasized that the test was the common sense of decency and modesty *of the community* and whether or not it was calculated to promote the *general corruption* of morals. This is in line with a general transition from the "standard of the weak and susceptible" to the "standard of the community".[9]

While these tests and definitions are taken from criminal cases, the court is of the opinion that the same standards and tests are to be used. The particular section involved is of recent enactment and has produced little interpretation.[10] However, the legislative history of the Act [11] and the similarity of the language used, indicates the relationship of this section to the criminal statute involved in the cited cases. It is significant that Congress chose the classical language of criminal regulations to express its intent.[12]

While the formulation of the test or definition is itself no easy task, the real problem is the *application* of the test to the matter immediately involved. The "community" referred to must, by virtue of the scope of the mails, be the entire nation. A determination of the national standard of decency and modesty is not an easy one for supermen, let alone postmen and judges. And yet, almost every aspect of our day-to-day conduct is judged by equally vague standards of "the reasonable man". Similarly, it is not unduly burdensome to charge reasonable men with the ability to discern between matter which might be termed merely in poor taste, and that which, when judged by the community standards of decency and modesty, be fairly said to offer a threat of moral depravity and corruption. "Every one who uses

cipient, libidinous thoughts, or to excite or give rise to sexually impure desires in the recipient, United States v. Wyatt, 3 Cir., 122 F. 316; matter having a likelihood to arouse the salacity of the recipient so as to outweigh any literary, scientific or other merits it may have, Walker v. Popenoe, 80 U.S.App.D.C. 129, 149 F.2d 511; having a tendency to deprave and corrupt, Krause v. United States, 4 Cir., 29 F.2d 248; having a tendency to deprave and corrupt the morals of those whose minds are open to such influences, and into whose hands it may fall, by arousing or implanting in such minds obscene, lewd, or lascivious thoughts or desires, Knowles v. United States, 8 Cir., 170 F. 409. See also collection of cases in Parmelee v. United

States, 72 App.D.C. 203, 113 F.2d 729; Annotations 76 A.L.R. 1099, 81 A.L.R. 801.

8. Burstein v. United States, 9 Cir., 178 F. 2d 665, 666.

9. See Parmelee v. United States, 72 App. D.C. 203, 113 F.2d 729, 731.

10. August 16, 1950, Chap. 721, 64 Stat. 451, 39 U.S.C.A. § 259a.

11. 1950 United States Code Congressional Service, pp. 3007–09.

12. The particular language of the complaint and administrative conclusions in the case at bar is the classical criminal phrase of "obscene, lewd and lascivious".

the mails of the United States for carrying papers or publications must take notice of what, in this enlightened age, is meant by decency, purity, and chastity in social life, and what must be deemed obscene, lewd, and lascivious."[13] In this evaluation we must, on the one hand, allow for the wide variety of tastes and opinions which have characterized and strengthened our nation, and yet, on the other hand, recognize and control the perverted thirsts for lust that lurk in a very few morally unbalanced individuals, and which might, if stimulated, offer a genuine threat to the safety and well-being of the community.

■■ With these tests and concepts in mind, the court has reviewed the films. Characterized generally, they portray young women dancing. The movements of the subjects are not particularly different from the movements involved in the popular dances of the day. The Post Office has labeled these movements "sexually suggestive". To so conclude would be to classify the great bulk of modern dancing as such. This court cannot conclude that this is the community consensus. The costumes of the subjects, while something considerably less than usual street dress, are not materially less than usual, modern beach-wear. Undoubtedly, some groups and individuals would be quick to condemn such attire generally. However, the court cannot feel but that such wear does have general community tolerance and in most areas has been met with at least general, passive acceptance. Finally, with recognition that while singly, the movements and costumes might not violate the standard, they might so offend in combination, the court cannot find such a violation from a general viewing. While probably some individuals might derive some sexual provocation from a viewing of the films, these same people would find equal or more stimulation from a perusal of the underwear advertisements in the daily papers, or in viewing the ballet or modern stage presentations, or in reading any one of many classics, or in viewing public parades or the holiday assemblages of persons at public beaches. These films are not unlike parts of major film productions of today shown, without challenge, at all theaters. The continued multi-million dollar gross from these major studio presentations indicates their community acceptance. To say the films have no reference to sex, would be naiveté in the ultimate. However, all references to sex are not unmailable. It is those references which violate and offend the common sense of decency and modesty of the community and which are calculated to promote the general corruption of morals, that are unmailable. The court can find no substantial evidence of the necessary forbidden character. In the court's opinion, these films are not of the type intended to be banned by Congress.

Counsel for plaintiffs will prepare the necessary order in conformance with this Memorandum.

13. Rosen v. United States, 161 U.S. 29, 42, 16 S.Ct. ·434. 438. 40 L.Ed. 606.